**Charles M. KEENAN, Plaintiff–Appellant,**

v.

**Frank HALL, Director Oregon Department of Corrections, et al., Defendants–Appellees.**

No. 94–35726.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 19, 1995.

Decided May 8, 1996.

Steven B. Berlin, Kenneth B. Stratton, Littler, Mendelson, Fastiff, Tichy & Mathiason, San Francisco, California, for plaintiff-appellant.

Richard D. Wasserman, Assistant Attorney General, Salem, Oregon, for defendants-appellees.

Before: SCHROEDER, FLETCHER, and RYMER, Circuit Judges.

Opinion by Judge FLETCHER; dissent by Judge RYMER.

FLETCHER, Circuit Judge:

Charles M. Keenan appeals the grant of summary judgment dismissing his prisoner's § 1983 action. Keenan alleged that the defendants transferred him without due process, confined him under cruel and unusual conditions, denied him his First Amendment rights, denied him access to the courts, wrongfully opened his mail from the courts outside his presence, and imposed an illegal fine. He seeks both damages and injunctive relief. We have jurisdiction, 28 U.S.C. § 1291, and we affirm in part and reverse in part.

## I. BACKGROUND

Keenan is an inmate of the Oregon State Prisons ("OSP"). On April 15, 1992, corrections officers discovered in Keenan's cell a pen packed with crushed match tips and two toothbrushes with razor blades attached to them. This was the third time that corrections officers had found Keenan in possession of homemade weapons.

On April 17 and April 20, 1992, prison authorities held a disciplinary hearing. They determined that Keenan had violated prison rules forbidding the possession of weapons and imposed the penalties of six months confinement in the Disciplinary Segregation Unit ("DSU") and a $325 fine. Keenan attended this hearing, as required by Oregon law, OAR 291–105–028(1), and had the opportunity to speak on his own behalf.

On April 24, 1992, prison authorities held a classification review of Keenan's custody status. The OSP assigns each inmate a custody status on the basis of behavior both in and out of prison, and the OSP uses custody status to determine each inmate's supervision level. At this hearing, prison authorities reclassified Keenan from the second-most supervised status ("close custody") to the most supervised status ("maximum custody"). The OSP houses maximum custody inmates

in administrative segregation in an Intensive Management Unit ("IMU"). Prison authorities did not allow Keenan to attend this hearing; Oregon law requires only notice and an opportunity to appeal, OAR 291–104–035 and –040.

When Keenan's disciplinary segregation ended, prison authorities transferred him from the DSU to the IMU and not back to the general prison population. Keenan remained in the IMU for six months. Keenan found many of the conditions there intolerable, including the noise, ventilation, lighting, food and water, lack of outdoor exercise, and lack of personal hygiene supplies. While at the IMU, Keenan complained that he had no direct access to the prison law library, although he did have the use of a "correspondence system." He complained that prison officials opened mail addressed to him from the courts outside of his presence. Keenan also objected to the OSP's "publishers only" rule, under which inmates may receive reading materials from outside the prison only from publishers.

Proceeding pro se, Keenan brought this prisoner's § 1983 action against 18 OSP officers and employees. The district court granted the defendants' motion for summary judgment on all of Keenan's claims. Keenan appeals with the assistance of counsel.

## II. DISCUSSION

This appeal presents six questions. First, did Keenan's transfer from the DSU to the IMU and not back to the general population violate his right to procedural due process? Second, were the conditions within the IMU cruel and unusual? Third, did OSP policies violate the First Amendment? Fourth, did the defendants violate Keenan's right to access to the courts? Fifth, did the defendants improperly open Keenan's mail from the courts outside of his presence? Sixth, was the $325 fine improper?

■ We review a grant of summary judgment de novo. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). Viewing the evidence in the light most favorable to the nonmoving party, we must decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## A. DUE PROCESS

■ Keenan argues that the defendants violated his procedural due process rights by deciding to transfer him to the IMU at a classification hearing held in his absence. Specifically, Keenan argues that the defendants should have allowed him the opportunity "to Speak in his [own] behalf, to Representation by Counsel or Counsel-substitute ... to have an Investigation conducted ... to develop a list of Witnesses and Questions to be posed to each Witness ... to present Documents [and] Physical Evidence," and to confront adverse witnesses and evidence. Amended Complaint of May 17, 1993, at 7. We remand Keenan's due process claim for reconsideration in light of *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In *Sandin*, the Supreme Court was called upon to determine whether Hawaii prison regulations or the Due Process Clause afforded Sandin a protected liberty interest that would entitle him to procedural protections before transfer into segregation. The Court held that prisoners have liberty interests protected by the Due Process Clause only where the contemplated restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300. In its specific application to inmate Sandin, the Court stated the test another way: "Based on a comparison between inmates inside and outside disciplinary segregation, the state's actions in placing [Sandin] there for 30 days did not work a major disruption in his environment." *Id.* at ——, 115 S.Ct. at 2301. The Court rejected its prior test traditionally used to determine whether a prison regulation creates a liberty interest, to wit: whether the relevant regulation contains language that is mandatory or discretionary. *Id.* at —— ——, 115 S.Ct. at 2298–2300. The Court in its new approach seeks to prevent turning every rule or regulation that establishes a procedure or requires the provi-

sion of an amenity into a right that implicates a liberty interest. It cited examples, inter alia: tray lunches rather than sack lunches, any book that is not a security threat, and cells with TV and electric outlets.

■ The district court in the case before us, without the benefit of *Sandin,* understandably looked to the old mandatory/discretionary and punitive/administrative dichotomies, and did not apply the new "atypical and significant hardship" or "major disruption in environment" test. *Sandin* leaves the new test to be fleshed out in subsequent cases. In this case, the district court on remand will be on the cutting edge of this process. We suggest that if it finds conditions in the IMU that violate the Eighth Amendment, the transfer to the IMU would impose "atypical and significant hardship."

We do not suggest, however, that the new test is synonymous with Eighth Amendment violation. What less egregious condition or combination of conditions or factors would meet the test requires case by case, fact by fact consideration. The *Sandin* Court seems to suggest that a major difference between the conditions for the general prison population and the segregated population triggers a right to a hearing. *Id.* at ——, 115 S.Ct. at 2301. We do know that relevant factors include whether there is a likelihood that the transfer will affect the duration of Keenan's sentence, *id.* at ——, 115 S.Ct. at 2302, and the duration of the transfer, *id.* at ——, 115 S.Ct. at 2301 (noting the segregation lasted only 30 days); *see Hutto v. Finney,* 437 U.S. 678, 686–87, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.").

If the district court determines that Keenan had a protected liberty interest in freedom from transfer to the IMU, it must then decide whether the defendants gave Keenan all of the process he was due under *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Sandin,* —— U.S. at ——, 115 S.Ct. at 2300 ("The time has come

to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that states may under certain circumstances create liberty interests which are protected by the Due Process Clause."). Keenan wanted to attend the reclassification hearing of April 24, 1992, in order to call witnesses, present evidence, confront adverse evidence, and explain his views. Ordinarily, the prisoner should be allowed to do so. *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979–80. However, we do not preclude here the possibility that the district court may find relevant to its determination the fact that Keenan did attend and speak at the disciplinary hearing held just days earlier, which dealt with whether he had weapons in his possession and whether he had prior infractions.

## B. CONDITIONS OF CONFINEMENT

■ Keenan argues that the district court erred by dismissing on summary judgment his Eighth Amendment claims challenging the conditions at the IMU. To sustain an Eighth Amendment claim, the plaintiff must prove a denial of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), occurring through "deliberate indifference" by prison personnel or officers, *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991) (citations omitted). The majority in *Wilson,* while reiterating the *Rhodes* standard, elaborated that cruel and unusual punishment under the Eighth Amendment has both objective and subjective components. *Id.* Applying these standards, we conclude that Keenan produced sufficient evidence to proceed to trial on his claims concerning outdoor exercise, noise, lighting, ventilation, personal hygiene, and food and water. Summary judgment for the defendants was proper on Keenan's other claims.

### 1. EXERCISE

■ Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation. *Spain v. Procunier,* 600 F.2d

189, 199 (9th Cir.1979) (Kennedy, J.) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates."). *See also Toussaint v. Yockey*, 722 F.2d 1490, 1492–93 (9th Cir.1984) (upholding preliminary injunction requiring outdoor exercise); *Allen v. Sakai*, 48 F.3d 1082, 1087–88 (9th Cir.1994) (no qualified immunity to outdoor exercise claim), *cert. denied*, — U.S. —, 115 S.Ct. 1695, 131 L.Ed.2d 559 (1995).

The parties agree that the defendants did not provide Keenan with outdoor exercise while he was confined at the IMU. *See* Amended Complaint of May 17, 1993, at 8 (claiming defendants restricted his exercise to a 10' by 12' room);[1] Affidavit of Theodore S. Long of Nov. 3, 1993, at 4–5 (admitting defendants restricted his exercise to a 8' by 21' by 16' space with a roof, three concrete walls, and a fourth wall of perforated steel admitting sunlight through only the top third). Keenan produced sufficient evidence to proceed to trial on his exercise claim.[2]

### 2. NOISE

 "[P]ublic conceptions of decency inherent in the Eighth Amendment require that [inmates] be housed in an environment that, if not quiet, is at least reasonably free of excess noise." *Toussaint v. McCarthy*, 597 F.Supp. 1388, 1397, 1410 (N.D.Cal.1984) (finding an "unrelenting, nerve-racking din"), *aff'd in part, rev'd in part on other grounds*, 801 F.2d 1080, 1110 (9th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

Keenan alleged that at all times of day and night inmates were "screaming, wailing, crying, singing and yelling," often in groups, and that there was a "constant, loud banging." Amended Complaint of May 17, 1993, at 8.

While the defendants produced contrary evidence, *see* Affidavit of Theodore S. Long of Nov. 3, 1993, at 3 (denying knowledge of the banging, and claiming to have moved inmates who became "major noise problem[s]" to muffled cells), Keenan produced sufficient evidence to make his noise claim a disputed issue of material fact not subject to summary judgment.

### 3. VENTILATION

 Inadequate "ventilation and air flow" violates the Eighth Amendment if it "undermines the health of inmates and the sanitation of the penitentiary." *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir.1985).

Keenan alleged his cell was "permeated with Stale air that is Saturated with the Fumes of Feces (thrown by some inmates), the smell of urine and vomit as well as other stale bodily odors." Amended Complaint of May 17, 1993, at 9. If the air was in fact saturated with the fumes of feces, urine, and vomit, it could undermine health and sanitation. While the defendants produced contrary evidence, *see* Affidavit of Theodore S. Long of Nov. 3, 1993, at 6 (claiming a state-of-the-art ventilation system kept the air clean), Keenan produced sufficient evidence to make his ventilation claim a disputed issue of material fact not subject to summary judgment.

### 4. LIGHTING

 "Adequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment." *Hoptowit v. Spellman*, 753 F.2d at 783. Moreover, "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." *LeMaire v. Maass*, 745 F.Supp. 623, 636 (D.Or.1990), *vacated on oth-*

---

1. A verified complaint may be treated as an affidavit to oppose summary judgment to the extent it is "based on personal knowledge" and "sets forth specific facts admissible in evidence." *McElyea v. Babbitt*, 833 F.2d 196, 197–98 & n. 1 (9th Cir.1987).

2. The district court suggested that *Spain* is inapposite because it involved isolation for a period

of years. *See Spain*, 600 F.2d at 200 (segregation lasted four years). However, other cases applying *Spain*'s guaranty of outdoor exercise have involved shorter periods. *See, e.g., Toussaint v. Yockey*, 722 F.2d at 1493 (segregation for "over one year"); *Allen*, 48 F.3d at 1087–88 (segregation for six weeks, but potentially indefinite).

*er grounds*, 12 F.3d 1444, 1458–59 (9th Cir. 1993).

Keenan alleged that large florescent lights directly in front of and behind his cell shone into his cell 24 hours a day, so that his cell was "constantly illuminated, and [Keenan] had no way of telling night or day," and that this condition caused him "grave sleeping problems" and other mental and psychological problems. Amended Complaint of May 17, 1993, at 9–10; Motion to Submit Additional Authorities of Feb. 24, 1994, ex. 1 at 2. While the defendants produced contrary evidence, *see* Affidavit of Theodore S. Long of Nov. 3, 1993, at 8 (claiming an inmate would not be affected by the lights if he slept with his head towards the back of his cell), Keenan produced sufficient evidence to make his lighting claim a disputed issue of material fact not subject to summary judgment.

### 5. PERSONAL HYGIENE ITEMS

 Indigent inmates have the right to personal hygiene supplies such as toothbrushes and soap. *See Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982) (the Eighth Amendment guarantees sanitation); *Toussaint*, 597 F.Supp. at 1411 (the Eighth Amendment guaranties personal hygiene). Keenan alleged the defendants gave him personal hygiene items only when he could pay for them, Amended Complaint of May 17, 1993, at 10, and that the prison's indigency level forced him to choose between hygiene items and legal supplies, *id.* at 13. While the defendants produced contrary evidence, *see* Affidavit of Theodore S. Long of Nov. 3, 1993, at 9 (claiming the OSP issues every inmate free soap, toothbrushes, baking soda, linens, and towels), Keenan produced sufficient evidence to make his sanitation claim a disputed issue of material fact not subject to summary judgment.

### 6. FOOD AND WATER

 Adequate food is a basic human need protected by the Eighth Amendment. *Hoptowit v. Ray*, 682 F.2d at 1246. While prison food need not be "tasty or aesthetically pleasing," it must be "adequate to maintain health." *LeMaire*, 12 F.3d at 1456.

Keenan alleged that the food at the IMU was "spoiled, tampered with, cold, raw, [and failed] to meet a balanced nutritional level," and that the water was "Blue/Green in Color and Foul Tasting." Amended Complaint of May 17, 1993, at 8, 9. Food that is spoiled and water that is foul would be inadequate to maintain health. While the defendants produced contrary evidence, *see* Affidavit of Theodore S. Long of Nov. 3, 1993, at 8 (claiming that all inmates and staff drink the same water and eat the same food, and that recent water quality tests showed that the water was "pristine"), Keenan produced sufficient evidence to make his food and water claim a disputed issue of material fact not subject to summary judgment.

### 7. MEDICAL CARE

 The Eighth Amendment guarantees adequate medical care for inmates. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992) (citations omitted). However, Keenan offered no evidence, even in the form of specific examples in his complaint, to support his claim that medical care at the IMU was inadequate. Summary judgment dismissing Keenan's medical care claim was proper.

### 8. TEMPERATURE

 The Eighth Amendment guarantees adequate heating. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.1980). However, Keenan alleged only that average temperatures in his cell "tend[ed]" to be either "well above" or "well below" room temperature, Amended Complaint of May 17, 1993, at 8, which suggests only that the temperature was not comfortable. Summary judgment dismissing Keenan's temperature claim was proper.

### 9. CELL SIZE

 Keenan alleged that his cell was 6' by 9', or 54 square feet, Amended Complaint of May 17, 1993, at 9; the defendants claimed Keenan's cell was 6' by 10', or 60 square feet, Affidavit of Theodore S. Long of Nov. 3, 1993, at 2. Either way, the Constitution does not guarantee Keenan more space. *See Rhodes v. Chapman*, 452 U.S. 337, 341, 101

S.Ct. 2392, 2396, 69 L.Ed.2d 59 (1981) (63 square feet sufficient for two inmates); *Hoptowit v. Ray,* 682 F.2d at 1248–49 (adequacy of cell size must be judged for its effect on "areas that are constitutionally protected"); *Morales–Feliciano v. Parole Bd. of the Commonwealth of Puerto Rico,* 887 F.2d 1, 5 (1st Cir.1989) (affirming fine for failure to comply with order to provide 35 square feet), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); *Peterkin v. Jeffes,* 855 F.2d 1021, 1026 n. 8 (3rd Cir.1988) (60 square feet sufficient). Summary judgment dismissing Keenan's living space claim was proper.

### 10. VERBAL HARASSMENT

■■■■ Keenan alleged that prison guards made "disrespectful and assaultive comments" to him. However, verbal harassment generally does not violate the Eighth Amendment. *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987) (citations omitted) (directing vulgar language at inmate does not state a constitutional claim). Keenan has not presented evidence that these comments were unusually gross even for a prison setting and were calculated to and did cause him psychological damage. Here, Keenan alleged only that the comments denied him "peace of mind." Summary judgment dismissing Keenan's verbal harassment claim was proper.

### 11. RESTRAINTS

■■■ Keenan alleged that every time IMU guards moved him from his cell, they placed him in restraints that caused pain and cuts. However, for the protection of staff and other inmates, prison authorities may place a dangerous inmate in shackles and handcuffs when they move him from his cell. *LeMaire,* 12 F.3d at 1457. Keenan does not allege cruel conduct causing discomfort beyond that inherent from movement in restraints. Summary judgment dismissing Keenan's restraints claim was proper.

### 12. VISITORS

■■■ Keenan alleged the defendants denied him visits from persons other than his immediate family. However, there is no constitutional right to "access to a particular visitor." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989). Summary judgment dismissing Keenan's visitation claim was proper.

### 13. CANTEEN ITEMS

■■■ Keenan alleged the defendants denied him canteen products such as birthday cards. However, there is no constitutional right to such items. Summary judgment dismissing Keenan's canteen items claim was proper.

## C. FIRST AMENDMENT CLAIMS

Keenan argues that the district court erred by dismissing on summary judgment his First Amendment claims. We conclude that Keenan produced sufficient evidence to proceed to trial on his reading materials claims. Summary judgment for the defendants was proper on Keenan's other First Amendment claims.

### 1. TELEPHONE ACCESS

■■■ Prisoners have a First Amendment right to telephone access, subject to reasonable security limitations. *Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir.1986). Keenan alleged he was "Denied ... Use of a Telephone for personal, Legal and/or Emergency Calls." Amended Complaint of May 17, 1993, at 10. However, defendants claimed Keenan had access to telephones for emergency and legal calls. Affidavit of Theodore S. Long of Nov. 3, 1993, at 10–11. Because Keenan did not specify whether the alleged denial of telephone access was total, partial, or even occasional, and did not allege that he was denied access for a specific emergency or call to his lawyer on an occasion when he had a specific need, we conclude his allegations were insufficient. Summary judgment dismissing Keenan's telephone claim was proper.

### 2. SPIRITUAL GUIDANCE

■■■ Keenan alleged the defendants refused to allow a Native American spiritual leader to enter the IMU and speak with the inmates. However, Keenan claimed neither

adherence to a Native American religion nor having ever requested religious guidance from a Native American spiritual leader. Having failed to identify an injury in fact to himself from such refusal, Keenan lacked standing to challenge it. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). Summary judgment dismissing Keenan's religious advisor claim was proper.

### 3. READING MATERIALS

Keenan challenged the OSP's "publishers only" rule, under which only publishers may send reading materials from the outside to the inmates. *See* OAR 291–131–025(4) ("New books, magazines, and newspapers, shall only be received directly from the publisher."). In *Bell v. Wolfish,* 441 U.S. 520, 550, 99 S.Ct. 1861, 1880, 60 L.Ed.2d 447 (1979), the Supreme Court upheld against First Amendment challenge a publishers only rule that applied exclusively to hardback books. A broader ban might not survive challenge. In its rationale, *Bell* relied in part on the fact that inmates were allowed other reading matter, e.g. softback books and magazines. *Id.* at 551–52, 99 S.Ct. at 1880–81; *see Pratt v. Sumner,* 807 F.2d 817, 819–20 (9th Cir.1987). Also, the compelling state interest in prison security that justified the hardback rule in *Bell* may not justify a ban of other reading materials: "The particular security problem presented by the bindings of hardbound volumes appears to be inapplicable to newspapers, and possibly also to paperbound books." *Hurd v. Williams,* 755 F.2d 306, 308 (3rd Cir.1985). The court in *Hurd,* although recognizing the paucity of evidence in its case, "[left] open the possibility that the record in another case may raise sufficient question that the security risk in such materials has been exaggerated as to require a plenary trial on the issue." *See* Michael Mushlin, *Rights of Prisoners* § 5.04 at 234 (2d ed. 1993) ("Courts have been reluctant to sanction a soft-covered publisher only rule . . . .").

Although qualified immunity protects the defendants from liability on this claim, *Johnson v. Moore,* 948 F.2d 517, 520–21 (9th Cir.1991), on remand injunctive relief is not foreclosed if Keenan establishes his First Amendment claim. *American Fire, Theft & Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir.1991) ("Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief.") (citations omitted).

Keenan also challenges the limited number of books in the IMU library, the lack of access by IMU inmates to the main prison library and the state library, and the "no passing rule," under which inmates may not pass books to one another. We view these claims as part and parcel of Keenan's overall claim that inmates are deprived of reading material and they should be viewed by the district court on remand along with the deprivations imposed by the publishers only rule to determine whether the First Amendment is violated.[3]

### D. ACCESS TO THE COURTS

Keenan argues that the district court erred by dismissing on summary judgment his claim that the defendants violated his right to access to the courts by limiting his access to the law library, by providing inadequate copying and notary services, and by denying him contact visits with his lawyer. We disagree.

Inmates have a constitutional right to either assistance of a lawyer, or access to a law library. *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977); *Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 854–55 (9th Cir.1985). The defendants provide IMU inmates such as Keenan access to a law library correspondence system, under which inmates may not visit the law library or possess hardbound books, but may obtain copies of requested materials within 24 hours, indexes to help choose materials, and weekly assistance from

---

3. Judge Slovitz in *Hurd* poignantly noted: "To rephrase a French saying, a day without reading is like a week without sunshine." *Hurd,* 755 F.2d at 309. Although the saying can hardly serve as the standard to judge First Amendment violations, it highlights the importance of reading in a civilized society.

inmate law clerks. Although an inmate in segregation may prevail on a denial of access claim if he has a particular need for more access than that allowed him, and that denial has caused him actual harm, such a system as that afforded here in a high security unit has been upheld as generally adequate. *See Wood v. Housewright,* 900 F.2d 1332, 1334, 1335 (9th Cir.1990); *Oltarzewski,* 830 F.2d at 138. Keenan has not shown inadequate access.

■■■ Keenan claimed that photocopy and notary services were too slow and expensive. However, to state an access to the courts claim that concerns neither the inadequacies of the law library nor the lack of assistance of a person trained in law, an inmate must demonstrate "actual injury," i.e. "some specific instance in which an inmate was actually denied access to the courts." *Sands v. Lewis,* 886 F.2d 1166, 1171 (9th Cir.1989) (quotations and citations omitted). Keenan has alleged no actual injury related to copying and notary services.

■■■ Keenan claimed the defendants denied him contact visits with his lawyer. However, while the Constitution protects such visits, *Ching v. Lewis,* 895 F.2d 608, 610 (9th Cir.1990), prison officials may restrict this right where high-risk inmates such as Keenan are involved, *Casey v. Lewis,* 4 F.3d 1516, 1520–23 (9th Cir.1993) (applying the "legitimate penological interests" test of *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987), to *Ching* ). Keenan has not alleged that the denial of contact visits with his lawyer has denied him access to his lawyer or prejudiced his access to the courts.

## E. LEGAL MAIL

■■■ Keenan argues that the district court erred by dismissing on summary judgment his claim that the defendants improperly opened mail to him from the courts outside his presence. We disagree.

Our conclusion turns on the definition of "legal mail." Mail from the courts, as contrasted to mail from a prisoner's lawyer, is not legal mail. *See Martin v. Brewer,* 830 F.2d 76, 78 (7th Cir.1987) ("[W]ith minute and irrelevant exceptions all correspondence from a court to a litigant is a public document, which prison personnel could if they want inspect in the court's files."). On four occasions, court clerks sent mail to Keenan without writing "Legal Mail" on the envelope, and on each occasion OSP officials opened this mail outside of Keenan's presence.

Keenan does not allege that mail from his lawyer was received and opened outside his presence. The OSP opens and inspects all incoming mail, OAR 291–131–015(4), but does not open and inspect legal mail outside of the receiving inmate's presence, OAR 291–131–030(2). The OSP defines legal mail to include mail from lawyers and courts but it must have the words "Legal Mail" written on the envelope, OAR 291–131–010(13). We do not have the occasion on these facts to decide and we do not decide whether mail clearly sent from a lawyer to an inmate but lacking the "Legal Mail" designation may be opened outside the presence of the inmate.

## F. THE FINE

■■■ Keenan argues that the district court erred by dismissing on summary judgment his claim that the $325 fine exceeded the sanctions guidelines of Oregon's prison regulations. We disagree.

Keenan's possession of an explosive device violated OAR 291–105–015(1)(e) ("Contraband II"). The defendants imposed as punishment 14 days disciplinary segregation and a $25 fine for this infraction. Keenan's possession of homemade knives violated OAR 291–105–015(4)(j) ("possession of a dangerous weapon"). For this infraction, the defendants imposed as punishment 180 days disciplinary segregation and a $300 fine.

The Major Violation Grid contained in Oregon's prison regulations authorizes a $50 fine and up to three weeks disciplinary segregation to penalize violation of the "Contraband II" rule. Keenan's $25 fine and 14 days of segregation did not exceed these sanctions guidelines.

The grid authorizes a $200 fine and 120 days of disciplinary segregation to penalize possession of a dangerous weapon. While

 

Keenan's $300 fine and 180 days of segregation exceeded these sanctions guidelines by 50%, OSP officials have the discretion to deviate upward from the grid by up to 50%. OAR 291–105–072. Keenan's sanctions did not exceed this limit. Nothing in the rules prevents more than one rule infraction to be written up in one disciplinary report and separate sanctions to be imposed for each infraction. Deviations must be supported by written findings, *id.;* the defendants explained in writing that Keenan possessed two knives, that this was the third time he had been caught in possession of homemade knives, and that these knives were especially dangerous because other inmates knew that Keenan had them. In short, the deviation was authorized by Oregon law.

### III. CONCLUSION

We affirm the district court's grant of summary judgment dismissing certain of Keenan's Eighth Amendment and First Amendment claims, as well as his claims regarding access to the courts, mail from the courts, and the fine. We reverse the district court's grant of summary judgment dismissing certain of Keenan's Eighth Amendment and First Amendment claims and remand them for trial, and we remand Keenan's due process claim for reconsideration in light of *Sandin.*

AFFIRMED IN PART; REVERSED IN PART.

RYMER, Circuit Judge, Dissenting:

Under *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Keenan's transfer into the IMU does not implicate a liberty interest unless his confinement there "impose[d] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300. Transfer from the general population to maximum security is "within the normal limits or range of custody which the conviction has authorized the State to impose," even when the conditions in maximum security are "substantially more burdensome." *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976). As Keenan's confinement in maximum security was "within the normal limits or range of custody," it follows that it could not have imposed an "atypical and significant hardship" on him. For the reasons stated by the district court, I also cannot agree that Keenan's claims regarding the conditions of his confinement survive summary judgment. I therefore dissent.