**William BRYANT, Plaintiff,**

v.

**R. CORTEZ, et al, Defendants.**

**No. CV 03–9424–RGK PJW.**

United States District Court, C.D. California.

Jan. 23, 2008.

---

Lena T. Afary, CAAG–Office of Attorney General of California, Los Angeles, CA, for Defendants.

## ORDER ACCEPTING REPORT AND ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

R. GARY KLAUSNER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Complaint, the records on file, and the Report and Recommendation of United States Magistrate Judge. No objections to the Report and Recommendation have been filed. The Court accepts the Magistrate Judge's Report and adopts it as its own findings and conclusions.

## REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PATRICK J. WALSH, United States Magistrate Judge.

This Report and Recommendation is submitted to the Hon. R. Gary Klausner, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that Defendants' summary judgment motion be granted.

## I.

## SUMMARY OF FACTS AND PROCEEDINGS

Plaintiff brings this civil rights action against nine members of the prison staff at California State Prison, Los Angeles County ("CSP–LAC") in Lancaster, accusing them of violating his federal civil rights while he was an inmate at that institution.[1]

William Bryant, Calipatria, CA, pro se.

1. Plaintiff named as Defendants Internal Affairs Special Agent R. Cortez, Custody Cap-

According to Plaintiff, on January 15, 2002, Defendants Cortez and Garcilazo ordered Plaintiff placed into administrative segregation in order to "preserve the integrity of [an] investigation" of Plaintiff's "alleged involvement in a conspiracy to smuggle narcotics into CSP–LAC."[2] (Plaintiff's Opposition to Defendants' Notice of Motion and Motion for Summary Judgment or in the Alternative, for Partial Summary Judgment ("Opposition"), Exh. A; Complaint at 4–5, 8.) According to Plaintiff, Defendants Cortez and Garcilazo took him to an interview room, where Cortez and another Internal Affairs officer attempted to solicit information about correctional officers involved in the conspiracy. (Opposition at 4, 28.) Plaintiff alleges that when he did not cooperate with the officers, Defendant Cortez threatened him, telling him that he would be placed in administrative segregation "indefinitely" and that his mother would be prosecuted for her role in bringing drugs into the prison. (Opposition at 28.) An ASU Placement Notice prepared at the time stated that Plaintiff would remain in administrative segregation "pending conclusion of this investigation." (Opposition, Exh. A.)

On January 18, 2002, Defendant Cortez issued a Rules Violation Report ("RVR") in which he noted that he had "concluded" his investigation into Plaintiff's involvement in the narcotics conspiracy and had found proof "without a doubt that [Plaintiff] is guilty of conspiring to introduce controlled substances into CSP–LAC." (Opposition, Exh. B., RVR.) Defendant Cortez and Special Agent J. Jansen reported that an inmate-informant had come forward with information about a shipment of marijuana to the prison. (Opposition, Exhs. S, Dec. of R. Cortez, ¶ 4 and V, Dec. of G. Jansen, ¶ 3.) On December 14, 2001, a package containing approximately two pounds of marijuana arrived at CSP–LAC in the manner that the informant had described. (*Id.*) Postal authorities traced the package's origin to the Pasadena Post Office, where a surveillance camera had recorded the sender as a woman wearing a name tag with "Bryant" printed on it. (*Id.*) A search of Department of Motor Vehicles records identified the woman as Plaintiff's mother, Tessie Mae Bryant. (*Id.*) Recordings of telephone conversations on prison phones revealed two calls between a male inmate identified as "Billy" and a female in which they discussed "prices" and the mailing of a package from Pasadena on December 10, 2001. (*Id.*) Plaintiff received a copy of the RVR on January 25, 2002. (Opposition at 12.)

On January 16, 2002, Defendant Meadors told Plaintiff that he would remain in administrative segregation pending review by the Institutional Classification Commit-

---

tain T.W. Meadors, Correctional Lieutenant J. Garcilazo, Chief Deputy Warden M. Hunter, Correctional Counselors W. Burgess and V. Chagnon, Associate Warden L. Schulteis, and Classification Staff Representatives F. Jaramillo and M. Diaz. Throughout the pleadings, both Plaintiff and Defendants refer to Defendant Schulteis variously as "Shulteis" and "Shulties." However, Defendant appears to sign her name "Schulteis" and the Court adopts this spelling. (*See* Plaintiff's Opposition to Defendants' Notice of Motion and Motion for Summary Judgment or in the Alternative, for Partial Summary Judgment, Exh. P at 1.)

2. Plaintiff appears to use the terms "solitary confinement" and "administrative segregation" interchangeably, notwithstanding their very different connotations. Plaintiff provides no evidence he was ever placed in solitary confinement. To the contrary, all the evidence provided by both Plaintiff and Defendants indicates that Plaintiff had another inmate assigned to his cell in the Administrative Segregation Unit ("ASU"). (See, e.g., Deposition of William Bryant at 66 (complaining of "being forced to be in a cell with another ... man").) Moreover, Plaintiff had access to the exercise yard three times a week and could see visitors one hour a week. (*Id.* at 64–65.)

tee ("ICC"). (*Id.*) On February 6, 2002, the ICC reviewed Plaintiff's administrative segregation classification. (*Id.*) Plaintiff claims that Defendant Schulteis initially ordered that the RVR be adjudicated immediately. (Opposition at 7.) According to Plaintiff, Defendant Garcilazo objected and held an off-the-record meeting with Defendants Schulteis and Chagnon, after which Schulteis recommended extending Plaintiff's placement in the ASU for 180 days. (Complaint at 7–8; Opposition at 7–8.) On February 27, 2002, Defendant Jaramillo approved the recommendation to extend Plaintiff's housing in the ASU by 180 days. (Opposition at 12.) The notice provided to Plaintiff from the ICC stated that the purpose of housing Plaintiff in the ASU was to "protect the integrity of an ongoing investigation." (Opposition, Exhs.C–D.)

On August 7, 2002, the ICC recommended to extend Plaintiff's confinement in the ASU by an additional 120 days and Defendant Diaz approved the recommendation on September 9, 2002. (Opposition at 13.) Plaintiff received a copy of the decision in an ICC Classification "Chrono," which stated that the purpose of the extension was to "protect the integrity of an ongoing investigation." (Opposition, Exhs.E–F.)

On October 4, 2002, CSP–LAC transferred Plaintiff to the Los Angeles County Jail so that he could testify as a witness in the case against his mother, who had been charged in the narcotics conspiracy. (Exh. 3, Prisoner Movement History; Exh. 17, Superior Court Clerk's Record, *People v. Tessie May Bryant,* No. MA024133.) On May 2, 2003, Plaintiff's mother pled nolo contendere to possession of marijuana for sale, pursuant to a plea agreement. (Exh. 17, Clerk's Record, *People v. Tessie May Bryant,* No. MA024133.) On May 9, 2003, Plaintiff was transferred back to CSP–LAC. (Exh. 3.)

On May 15, 2003, the ICC recommended to extend Plaintiff's confinement in the ASU by an additional 90 days, "pending completion of the disciplinary process." (Opposition at 13, Exh. H, ASU Review Form.) Also on May 15, 2003, the Hearings Officer in Plaintiff's case concluded, after a hearing, that Plaintiff was not guilty of 0 conspiring to introduce narcotics into the prison. (Opposition, Exh. I, RVR Findings.) The Hearings Officer based this conclusion on the fact that the Confidential Disclosure Form, on which the allegations in the RVR were based, did not "disclose sufficient information for [Plaintiff] to prepare any type of meaningful defense." (Opposition, Exh. I.) Thus, the prosecution did not "comport with the criteria established in [California Code of Regulations] Section 3321(b)(3)." (*Id.*) On July 3, 2003, Plaintiff was released back into the general population. (Opposition at 14.)

On January 8, 2004, Plaintiff filed suit in this Court against Cortez and the other prison employees involved in his placement in the ASU, alleging that their actions violated (1) Plaintiff's Fourteenth Amendment due process rights, and (2) state law mandating Plaintiff be given a hearing within 30 days of receiving the charges. (Complaint at 9–12.) Plaintiff asked for injunctive relief and money damages. (Complaint at 13.)

Defendants now move for summary judgment. They contend that they are entitled to judgment as a matter of law because:

1. Plaintiff failed to establish a protected liberty interest warranting due process protection.

2. Plaintiff received all due process protections required under the Fourteenth Amendment.

3. Defendants are entitled to qualified immunity.

(Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment or in the Alternative, for Partial Summary Judgment ("Defendants' P & A Memo") at 5–18.)

Plaintiff has opposed the motion. In support of his Opposition, he attached a 46–page, handwritten memorandum of points and authorities, a nine-page affidavit, and hundreds of pages of exhibits.

## II.

### STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. A "genuine issue" exists only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party in a summary judgment motion is tasked with presenting admissible evidence that establishes that there is no genuine, material factual dispute and that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court views the evidence in a light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Under Rule 56, the non-moving party also has a burden in opposing I a summary judgment motion. He must make a "showing sufficient to establish the existence of an element essential to [his] case, and on I which [he] will bear the burden of proof at trial" because "a complete failure of proof concerning an essential element of [his] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. A non-moving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R.Civ.P. 56(e); *see also Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir.1988).

## III.

### DISCUSSION

A. *Plaintiff's Due Process Claims*

Plaintiff alleges that the delay in adjudicating his RVR violated due process. (Complaint at 9–10.) Plaintiff also contends that his placement in administrative segregation for approximately 18 months without a hearing did not comport with the Fourteenth Amendment's due process requirements. (Complaint at 10–12.) As set forth below, even if Plaintiff's factual claims were true, they are insufficient to state a constitutional claim.

The Due Process Clause of the Fourteenth Amendment bars the deprivation of liberty without due process of law. *See Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In order to invoke the protection of the Due Process Clause, an inmate must first establish the existence of a liberty interest and then show that it was denied without due process. *Sandin v. Conner*, 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir.1995).

As will be discussed below, the Court finds that Plaintiff has failed to establish that there is a genuine issue of material fact in dispute regarding Plaintiff's claim that his due process rights were violated in the disciplinary proceedings. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Therefore, Defendants are entitled to summary judgment.

### 1. *Protected Liberty Interests*

■ The Constitution itself does not confer on a prisoner a liberty interest in avoiding "more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). State regulations, however, may create a liberty interest in avoiding more restrictive confinement where the nature of the confinement "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 223, 125 S.Ct. 2384 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293); *see also Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir.2003).

Plaintiff alleges that his liberty interests were violated when he was placed in the ASU because confinement in the ASU resulted in atypical and significant hardship on him. (Opposition at 2, 4–5, 14, 17, 19–20, 27, 30, 38–39.) In support of his contention, Plaintiff lists privileges available to him in the general prison population that were restricted in the ASU. For example, Plaintiff contends that his exercise, shower, hygiene, and visitation privileges were reduced in the ASU. (Affidavit by William Bryant the Plaintiff in Support of Plaintiff Opposition to Defendants' Notice of Motion and Motion for Summary Judgment or in the Alternative, for Partial Summary Judgment ("Affidavit") at 7.) Plaintiff also points out that he was not allowed phone calls or contact visits while in the ASU.[3] (Affidavit at 7.) In addition, Plaintiff alleges that, while in the ASU, he was unable to participate in vocational, educational, recreational, or rehabilitation programs and activities. (Affidavit at 7.) Plaintiff also asserts that, when he was transferred to the Los Angeles County Jail in order to testify at his mother's trial, he was placed in I maximum security, where conditions were "horrible," as a result of his ASU status. (Affidavit at 7–8.) Finally, Plaintiff complains that administrative segregation strained his relationship with his kids and their mother, resulting in "severe mental-stress." (Affidavit at 9.)

■ Defendants do not challenge Plaintiff's claims regarding conditions and restrictions in the ASU. Rather, they argue that Plaintiff's ASU confinement did not involve any protected liberty interests. (Defendants' P & A Memo at 11.) The Court agrees.

■ Determining whether a prison condition is "atypical and significant" requires consideration of the specific facts of each case. *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir.1996). The Court considers three guideposts in framing the inquiry: (1) whether the challenged condition mirrored those conditions imposed upon inmates in administrative segregation and protective custody, and thus comported with the prison's discretionary authority; (2) the duration of the condition and the degree of restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence. *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003).

In this case, the challenged condition *is* administrative segregation. Administrative segregation in and of itself generally does not implicate a protected liberty in-

---

**3.** According to Plaintiff, he was permitted a one-hour visit each week through a glass partition while housed in the ASU. (Affidavit at 7.)

terest. *Id.; see also May v. Baldwin,* 109 F.3d 557, 565 (9th Cir.1997)(noting that a prisoner "has 'no liberty interest in freedom from state action taken within the sentence imposed,' ... and the Ninth Circuit explicitly has found that administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence") (citations omitted).

Neither the degree nor the duration of the restraint imposed by administrative segregation gives rise to a protected liberty interest. Although, clearly, a reduction in the level of Plaintiff's privileges would be unpleasant, even accepting Plaintiff's version of the conditions in the ASU, the Court cannot conclude that the restrictions on Plaintiff's exercise, shower, hygiene, and visitation privileges amounted to "a major disruption in his environment." *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293. Nor does the loss of work and educational opportunities implicate constitutional concerns. *Baumann v. Ariz. Dept. of Corr.,* 754 F.2d 841, 846 (9th Cir.1985). Moreover, the loss of telephone privileges does not constitute a constitutional violation given the availability of alternative means of communication by mail or in person. *Cf. Overton v. Bazzetta,* 539 U.S. 126, 135, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003)(finding that existence of alternative means of communication provided some evidence that regulations restricting visitors were reasonable).

Nothing about the conditions in the ASU indicate that the prison could not arbitrarily choose to house Plaintiff there indefinitely. Administrative segregation does not constitute either a "major change in the conditions of confinement," like solitary confinement, *see Wolff,* 418 U.S. at 571 n. 19, 94 S.Ct. 2963, or the "intolerably cruel" confines of a "filthy, overcrowded cell and a diet of 'grue.' "[4] *Hutto v. Finney,* 437 U.S. 678, 686–87, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *see also Toussaint v. McCarthy,* 801 F.2d 1080, 1092 (9th Cir.1986)(noting that "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration"). Consequently, an 18–month period of confinement in the ASU during the course of a 33–year sentence does not create an atypical and significant hardship.

Plaintiff points to language in the California Penal Code and California Code of Regulations stating that prison officials "shall" conduct ICC hearings or resolve RVRs within certain timeframes. (Opposition at 9, 14–15, 18, 21, 25–26, 30.) He argues that this mandatory language creates a liberty interest in not being housed in the ASU. (Opposition at 18.) The Supreme Court, however, roundly rejected that approach in *Sandin* as "difficult to administer" and producing "anomalous results." 515 U.S. at 483 & n. 5, 115 S.Ct. 2293 ("[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause."); *see also Myron v. Terhune,* 476 F.3d 716, 718–19 (9th Cir.2007); *Keenan,* 83 F.3d at 1088–89. Finally, the Court notes that Plaintiff has not alleged that his confinement in the ASU will affect his release date.

### 2. *Due Process*

Even if the Court were to assume that Plaintiff had adequately established a protected liberty interest, Defendants would still be entitled to summary judgment be-

---

**4.** "Grue" refers to "a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste and baking the mixture in a pan." *Hutto,* 437 U.S. at 683, 98 S.Ct. 2565.

cause, as will be discussed below, Plaintiff's due process rights were not violated in the administrative hearing process.

 The Supreme Court has made clear that disciplinary proceedings are not part of a criminal prosecution and an inmate is not entitled to the full panoply of due process rights in such proceedings. *See Wolff,* 418 U.S. at 556, 94 S.Ct. 2963. An inmate only enjoys the right to: (1) written notice of the charges at least 24 hours prior to the disciplinary hearing; (2) the right to appear in person before an impartial hearing body; (3) the right to call witnesses and to present documentary evidence; (4) a written statement of reasons for the disciplinary action taken; and (5) assistance in obtaining and presenting evidence where the inmate is illiterate or the issue is too complex for the inmate to represent himself. *Id.* at 563–71, 94 S.Ct. 2963. Plaintiff received these protections with respect to the adjudication of his RVR. In fact, Plaintiff was found not guilty of the misconduct alleged in the RVR.

The Ninth Circuit has suggested that periodic review of a prisoner's retention in administrative segregation is necessary. *Toussaint,* 801 F.2d at 1101. In *Toussaint,* the court applied the now-defunct mandatory language approach to find a state-created liberty interest in freedom from administrative segregation. It did not specify a particular frequency with which a prison must review an inmate's placement. The Ninth Circuit opined, however, that a monthly review would satisfy due process whereas an annual review would not. *Id.* In Plaintiff's case, he received an initial ICC review approximately three weeks after his placement in the ASU. He received his next review approximately six months later, followed by another review four months after that. Shortly thereafter, Plaintiff was transferred to county jail for approximately seven months. Plaintiff received an ICC review within a week of his return to the prison and his final review occurred a month-and-a-half later.

 Given the circumstances of Plaintiff's case, a six-month interval between reviews did not amount to a violation of due process, assuming, *arguendo,* that Plaintiff had a liberty interest in freedom from the ASU. Defendants placed Plaintiff in the ASU for the purpose of maintaining the integrity of an ongoing investigation involving Plaintiff's mother, an unknown number of prison guards, and at least one other inmate. From their perspective, Defendants might reasonably have concluded that any prosecution of Plaintiff's mother—which might yield information relevant to their investigation—would not terminate within six months. In fact, the prosecution of Plaintiff's mother did not end until 15 months later. Moreover, in light of the complex nature of the smuggling conspiracy and the unknown number of participants, Defendants logically might have expected the investigation to last six months or more.

Plaintiff seems to believe that the investigation at issue only pertained to him, that this investigation concluded on January 18, 2002, and that, therefore, Defendants' stated reason for prolonging his housing in the ASU amounted to mere "pretext." (Opposition at 5–6, 10, 12–13, 20, 29.) The documentary evidence submitted by Plaintiff, however, provides proof to the contrary. Although Defendants initially placed Plaintiff in the ASU in part for disciplinary reasons, the ICC Classification Chronos do not limit the scope of the investigation to Plaintiff. Rather, they indicate that Plaintiff's segregation served to "protect the integrity of *an* ongoing investigation." (Opposition, Exhs. C–F (emphasis added).) Moreover, at the outset of the ASU placement, Plaintiff learned from Defendant Cortez that

correctional officers were under investigation as well. Plaintiff presents no evidence that Defendants continued to leave Plaintiff in the ASU to complete an investigation of him alone.

In this respect, Plaintiff's RVR is a red herring. Had Defendants kept Plaintiff in the ASU and delayed the RVR hearing for 18 months on a false claim that they needed more time to investigate him, then, assuming he had a liberty interest in release to the general population, Plaintiff would have presented a disputed issue of material fact. As discussed above, however, Defendants did not base Plaintiff's continued retention in the ASU wholly (if even partly) on the ground that they needed more time to investigate him. Thus, the delay in adjudicating the RVR cannot provide a basis for relief because Plaintiff suffered no injury from it.

Based on the uncontested facts in the record, Plaintiff received all the process he was due with respect to both the RVR adjudication and the ICC reviews. Accordingly, Defendants are entitled to summary judgment on Plaintiff's due process claims.

### B. *Plaintiff's Retaliation Claims*

Plaintiff contends that the length of his confinement in the ASU stemmed from retaliation based on his refusal to provide information that would assist in the investigation of corrupt prison officials. (Opposition at 28.) For the following reasons, this argument is without merit.

■ Prisoners may base retaliation claims on harms that would not raise due process concerns. *Resnick v. Hayes,* 213 F.3d 443, 449 (9th Cir.2000). A prisoner suing prison officials under § 1983 for retaliation must allege that (1) he was retaliated against for exercising his constitutional rights and (2) that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline. *Barnett v. Centoni,* 31 F.3d 813, 815–16 (9th Cir.1994); *see also Hines v. Gomez,* 108 F.3d 265, 267 (9th Cir.1997).

As Defendants explained to Plaintiff throughout his stay in the ASU, they kept him there in order to maintain the integrity of the ongoing investigation concerning drug smuggling. Plaintiff's mother was a key participant in this conspiracy, and the prison officials did not want to compromise their investigation by returning Plaintiff to the general population until the case against her and her co-conspirators was finished. As soon as Plaintiff's mother's prosecution ended in a plea agreement, Plaintiff returned to the prison and promptly had his outstanding RVR adjudicated. Less than two months later, Plaintiff was returned to the general population.

■ Maintaining the integrity of an investigation into serious institutional misconduct is a legitimate penological interest. Plaintiff offers no explanation, other than his conclusory allegation, why this proffered reason was a mere pretext. As a matter of law, it does not matter if the prison officials were motivated in part by a desire to retaliate against Plaintiff for his silence. Plaintiff must provide more than a scintilla of evidence that his confinement in the ASU did not advance *any* legitimate penological goals. Conclusory allegations will not suffice to survive summary judgment. *Taylor,* 880 F.2d at 1045. Defendants are therefore entitled to summary judgment on the retaliation claims.

### IV.

### CONCLUSION

For the reasons set forth above, it is RECOMMENDED that the Court enter an order: (1) accepting and adopting this Report and Recommendation, (2) directing that Defendants' motion for summary

judgment be granted and the case be dismissed with prejudice.[5]

---

**5.** Defendants have also raised a qualified immunity defense. Because the Court concludes that Defendants are entitled to judgment on other grounds, it need not and does not reach this defense at this time. Similarly, the Court need not address Defendants' evidentiary objections to the Opposition.