**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES ALLEN HYDRICK; DAVID
LANPHERE; SHAUNDALE GRIFFIN;
FRANK CISNEROS; PAUL PEDERSON;
STEVEN ROBERT CERNIGLIA; GARY
PRICE; DANIEL MROWICI; KENNETH
CIANCIO; MICHAEL MCCLURE; JAMES
MATA; RICHARD BISHOP; MELVIN
FIELDS; RON LEE; LEONARD PIERRE;
THOMAS PRICE; JIMMY GUTHRIE;
BRIAN KELLY; WOODROW JONES;
VASHON JACKSON; BRUCE RILEY;
FRED SCOTT; DEAN DANFORTH;
SAMMY PAGE; JAMES PETERS;
GRAYLING MITCHELL; CARLOS
SAUCEDO; ANTHONY DACAYONA;
CHARLES SALAS, et al.,
    *Plaintiffs-Appellees,*

    v.

MELVIN E. HUNTER, aka/Jon
DeMorales; CRAIG NELSON;
GRENDA ERNST,
    *Defendants-Appellants,*

No. 03-56712

D.C. No.
CV-98-07167-TJH

OPINION

and

ROBERT MCDANIEL; JERRY
REYNOLDS; ROBERT PENATE;
SAMUEL ROBINSON; MARK
MAHHONEY; STEPHEN MAYBERG;
ANITA JUDD; MICHAEL HUGHES; JIM
VESS; JACK TOWNSEND; MARK
PALMER; ROCKY SPURGEON; ARNIE
GOBBELL; JIM WILEY; MARK
KALIONZES; ELAINE SHERRILL; GLAN
MIKEL; JAN MAIRE ALARCON;
BARUCH MARGALIT; WILLIAM
KNOWLTON; DIANE IMRAM; CARMEL
MULLER; DALE ARNOLD; GABRIELLA
PALADINO; JEAN DANSEREAU et al.;
WILLIAM CHARLES THIEL; ROBERT
DOUGLAS LEFORT; ARNOLD
SCHWARZENEGGER, Governor of
California,
                          *Defendants.*

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Chief District Judge, Presiding

Argued and Submitted
April 5, 2005—Pasadena, California

Filed June 1, 2006

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson
and Stephen S. Trott, Circuit Judges.

Opinion by Judge Pregerson;
Partial Concurrence and Partial Dissent by Judge Trott

**COUNSEL**

Randall R. Murphy, Deputy Attorney General, Los Angeles, California, for the defendants-appellants.

Kathryn M. Davis, Latham & Watkins, Los Angeles, California, for the plaintiffs-appellees.

**OPINION**

PREGERSON, Circuit Judge:

Plaintiffs-Appellees represent a class of approximately 600 civilly committed persons and those awaiting commitment at Atascadero State Hospital pursuant to California's Sexually Violent Predators Act ("SVP Act"). In this suit, Plaintiffs allege that the conditions of their confinement violate their constitutional rights. They request declaratory and injunctive relief, as well as monetary damages. Defendants filed a

motion to dismiss based largely on qualified immunity, but their motion was summarily denied by the district court. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, and reverse in part.

## FACTUAL BACKGROUND[1]

### 1. California's Sexually Violent Predators Scheme

The SVP Act defines an SVP as a person "convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others" i.e., is "likely [to] engage in sexually violent criminal behavior." *See* Cal. Welf. & Inst. Code § 6600(a).[2] At least six months before a person who has committed the predicate offenses is to complete his sentence, he is evaluated by the Department of Corrections and Department of Mental Health. *Id.* § 6601. If those two departments agree that the person evaluated may be an SVP, a petition for commitment may be filed by the district attorney or counsel for the county in which the evaluated person was convicted. *Id.* § 6601(i). If that person is found by a jury to be an SVP who poses a danger to the health and safety of others, he is civilly committed for an indefinite period to commence *after* his criminal sentence is fulfilled. *Id.* §§ 6602-6604.

Once civilly committed, Plaintiffs undergo a five-phase treatment program. Phase One comprises group sessions that educate the SVP about California's SVP Act. During Phase One, the SVP is required to attend and participate in the treatment sessions. If he does not, his access level[3] is reduced and

---

[1] The following facts are taken from the complaint and are assumed to be true for purposes of reviewing this motion to dismiss.

[2] Although the SVP Act is gender-neutral, there was only one female SVP at the time of the filing of this complaint. She was not housed at Atascadero, and was, therefore, not included as part of the Plaintiffs' class.

[3] As explained in the complaint, all persons at Atascadero are assigned an Access Level that dictates access to various facilities and privileges. A

he is not allowed to advance to Phase Two of the treatment program. In addition, an SVP's failure to attend or participate in the treatment sessions is used against him at future probable cause and confinement hearings. The SVP cannot advance beyond Phase One unless he signs a statement in which he acknowledges that he has an "illness" that requires "treatment." Plaintiffs allege that the signed statements are often used against the SVP in future probable cause and confinement hearings.

Phases Two through Five of the treatment plan involve "cognitive" treatment. This treatment includes viewing videos that depict violent or other inappropriate sexual activities while a repugnant odor or other unpleasant sensation is applied to elicit a negative association.

Each year, a committed person has a right to a show cause hearing to determine whether his commitment should be continued. *Id.* § 6605(a)-(b). If it is found that the SVP continues to be a danger to the health or safety of the community, the person is committed for two years from the date of the finding. *Id.* § 6605(e). These successive periods of commitment can be continued indefinitely, or until the SVP completes all five phases of treatment. Upon successful completion of Phase Five, the SVP is conditionally released under the supervision of the California Mental Health Department. According to Plaintiffs, "only a handful of SVPs have been allowed into Phase Four and no SVP has progressed to Phase Five or ha[s] been found to be ready for release under the treatment protocol."[4]

---

Level 1 patient may not leave his unit without an escort, a Level 2 patient may leave his unit, but cannot go to the courtyard or canteen, a Level 3 patient may have some access to the law library, canteen and courtyard, etc.

[4]At oral argument it was alleged that, since the time Plaintiffs filed their complaint, three (of the over seven hundred) people committed under the Sexually Violent Predators Act have been released into their communities.

## 2. *The Current Lawsuit*

On September 2, 1998, Plaintiffs filed a *pro se* class action, under 42 U.S.C. § 1983, in district court against Defendants-Appellants Stephen Mayberg (Director of the California Department of Mental Health), Cal A. Terhune (Director of the California Department of Corrections), Jon DeMorales (former Executive Director at Atascadero State Hospital), Grenda Ernst (Clinical Administrator at Atascadero State Hospital), and Craig Nelson (Senior Psychologist Specialist at Atascadero State Hospital) (collectively "Defendants"). Plaintiffs sought injunctive and declaratory relief, as well as monetary damages, on the grounds that the policies and procedures that govern Plaintiffs' confinement and treatment at Atascadero State Hospital violate Plaintiffs' constitutional rights.

In March 1999, the district court appointed *pro bono* counsel for Plaintiffs. Counsel filed an amended complaint approximately five months later. Defendants filed a motion to dismiss. The motion to dismiss raised Eleventh Amendment and qualified immunity defenses. The district court denied Defendants' motion in a one line order.

Plaintiffs filed a second amended complaint on August 14, 2002.[5] Both the first and second amended complaints alleged that Defendants violated Plaintiffs' rights by, *inter alia*: (1) force-medicating Plaintiffs in non-emergency situations; (2) reducing Plaintiffs' access levels and other privileges as a form of punishment for refusing to participate in treatment sessions or as retaliation for filing lawsuits; (3) putting Plaintiffs in restraints for nonthreatening and/or nondisruptive conduct, including the refusal to participate in treatment or therapy; (4) subjecting Plaintiffs to public strip-searches (sometimes while in four-point restraints); (5) failing to pro-

---

[5]The second amended complaint substituted Melvin Hunter, the current Executive Director at Atascadero State Hospital, for Jon DeMorales, the former Executive Director, but contained no substantive alterations.

tect Plaintiffs from abuse of other patients or of Atascadero employees; (6) failing to provide Plaintiffs with constitutionally satisfactory conditions of confinement; (7) forcing Plaintiffs to participate in treatment; and (8) denying Plaintiffs adequate treatment, thereby converting Plaintiffs' civil confinement to a *de facto* extension of their prison sentence.

Once again, Defendants moved to dismiss the second amended complaint, on the same grounds presented in their first motion to dismiss. The district court again denied Defendants' motion to dismiss in a one line order. Defendants timely filed their notice of appeal. Defendants contend that the district court erred by failing to rule that the Eleventh Amendment, state abstention doctrine, or qualified immunity barred Plaintiffs' suit.

## *ANALYSIS*

### A.   Standard of Review

We review de novo the district court's denial of a motion to dismiss. *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). Immunity under the Eleventh Amendment presents a question of law, which we review de novo. *See Demshki v. Monteith*, 255 F.3d 986, 988 (9th Cir. 2001). To determine if Defendants are entitled to qualified immunity, we review de novo whether governing law was clearly established at the time of the alleged violation and whether the specific facts alleged constitute a violation of established law. *See Mabe v. San Bernardino County Dept. of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001).

Although a district court's denial of a motion under Federal Rule of Civil Procedure 12(b)(6) is not ordinarily appealable, the denial of a claim for immunity is appealable before final judgment under the collateral order doctrine and is reviewed de novo. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). All allegations of material fact are accepted as true and

should be construed in the light most favorable to Plaintiffs. *See Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). The "complaint should not be dismissed [under Rule 12(b)(6)] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

We note, again, the special difficulty of deciding the motion to dismiss a Defendant on qualified immunity grounds at this stage. Under the notice pleading standard of the Federal Rules, plaintiffs are only required to give a "short and plain statement" of their claims. Fed. R. Civ. Pro. 8(a)(2). Thus, "[w]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, [our] task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

As we recognized in *Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004), a motion to dismiss on qualified immunity grounds puts the court in the difficult position of deciding "far-reaching constitutional questions on a non-existent factual record." *Id.* at 957. We strongly suggested that, while "government officials have the right . . . to raise . . . qualified immunity defense on a motion to dismiss, the exercise of that authority is not a wise choice in every case." *Id.* We find that especially true here. The policy justifying qualified immunity motions at this stage is to protect officers against the burden of discovery and pre-trial motions. *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). In this case, the parties had already engaged in discovery for several years, and it appears that discovery was almost complete. Defendants could have presented this as a motion for summary judgment, and we would have a more developed factual record to guide our decision. Because Defendants' motion is framed as a motion to dismiss, we must evaluate the merits of Defendants'

qualified immunity defense before we know the full extent of the alleged abuses at Atascadero, or the reason behind Atascadero policy, or the level of involvement Defendants had in creating the conditions at Atascadero. As we decide Defendants' motion, however, we are cautious not to eviscerate the notice pleading standard in suits where qualified immunity is at issue. *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002).[6]

## B.   The Law of the Case Doctrine Does Not Apply

Plaintiffs argue that under the law of the case doctrine, we should not reach the merits of Defendants' appeal because Defendants' second motion to dismiss was barred by the district court's ruling that denied Defendants' first motion to dismiss. The relevant facts are as follows: after Plaintiffs filed their first amended complaint, Defendants filed a motion to dismiss on the grounds of failure to state a claim and qualified immunity. The district court denied Defendants' motion in a summary order, and Defendants did not appeal. Plaintiffs filed a second amended complaint, in which they changed only the name of one of the Defendants. Defendants then filed a motion to dismiss on grounds substantially similar to those stated in the first motion to dismiss. The district court again denied the motion to dismiss in a summary order. Plaintiffs argue that Defendants' second motion to dismiss is an imper-

---

[6]With all respect to our dissenting colleague, Plaintiffs' complaint states more than "violations of extremely abstract rights." *See* Dissent at 5962 (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). Maybe Plaintiffs can support these claims with evidentiary support and maybe they can't. Maybe Defendants can justify their behavior, or at least convince us that their conduct was not clearly in violation of Plaintiffs' rights. But the point of the Rule 12(b)(6) motion is not to evaluate the veracity of Plaintiffs' allegations, or to speculate as to Defendants' justifications for their actions. Rather, unless it is "beyond doubt" that the plaintiff cannot prove facts that would entitle him to relief, the Rule 12(b)(6) motion must be denied. *See Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). The standard is no different for a civil rights claim than for any other claim. *See Galbraith*, 307 F.3d at 1125-26.

missible "second bite at the apple" and should be dismissed under the law of the case doctrine.

**[1]** "Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) (citations omitted). For the law of the case doctrine to apply, "the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.' " *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000) (citing *Liberty Mutual Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982)); *United States v. Cote*, 51 F.3d 178 (9th Cir. 1995) ("[T]he law of the case acts as a bar only when the issue in question was actually considered and decided by the first court.").

**[2]** The district court denied Defendants' first motion to dismiss and their second motion to dismiss in a summary order. Thus the district court's grounds for rejecting Defendants' two motions are not explicit. Nor can we say that any issue was decided by implication in the first summary order denying Defendants' first motion to dismiss. Either motion could have been denied for any number of procedural or technical reasons unrelated to the substance of the motions. It is possible that Defendants' second motion *was* denied based on the law of the case doctrine, or that the district court decided, in its discretion, not to apply the law of the case doctrine due to subsequent changes in the law, or the "manifest injustice" that would result given the new party to the suit. *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). Because it is impossible for us to determine the basis of denial of *either* motion, we conclude that the "law of the case" does not apply and address the appeal on the merits.

## C. Eleventh Amendment Immunity and the Abstention Doctrine Do Not Bar Plaintiffs' Claims

**[3]** Defendants concede that suits for injunctive or declaratory relief do not violate the Eleventh Amendment under *Ex*

*parte Young*, 209 U.S. 123 (1908). Defendants contend, instead, that Plaintiffs' request for monetary damages against them is barred by the Eleventh Amendment to the Constitution. Defendants are correct that Plaintiffs cannot seek monetary damages against state officials in their *official* capacity. *See Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997). But the Eleventh Amendment does not bar suits seeking damages against state officials in their personal capacity. *See Hafer v. Melo*, 502 U.S. 21, 30 (1991); *Ashker v. Cal. Dep't of Corr.*, 112 F.3d 392, 394-95 (9th Cir. 1997).

**[4]** The second amended complaint states that Defendants acted in and are being sued in their individual *and* official capacities. This creates a presumption that Plaintiffs are seeking monetary damages against defendants in their personal capacity. *See Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) (stating a strong presumption in favor of a personal capacity suit where an official capacity suit for damages would be barred). Accordingly, the Eleventh Amendment does not bar Plaintiffs' claim for damages against Defendants in their individual capacities.

**[5]** Defendants also argue that they are immune from Plaintiffs' suit because Plaintiffs attempt to enforce pendent state law claims in federal court. Plaintiffs refer, in their first, second, and tenth claims for relief, to provisions in the California Constitution that parallel the applicable provision in the United States Constitution. Plaintiffs concede that they could not prevail on a § 1983 claim based on a violation of state law, because § 1983, by its own terms, protects only violations of federal law. *See Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981). Instead, they cite California law only where it is legitimate to do so, *e.g.*, where there is a state-created liberty or property interest at stake. *See, e.g., Paul v. Davis*, 424 U.S. 693, 710-12 (1976). Accordingly, Plaintiffs' claims are not barred on this ground, and we need not consider Defen-

dants' arguments that Plaintiffs' state law claims are "novel and complex" under 28 U.S.C. § 1367(c).[7]

## D. Plaintiffs' Section 1983 Claims

[6] Defendants' first substantive argument is that Plaintiffs have not properly pled a claim under Section 1983, in that they are not proper defendants for a suit. "To sustain an action under section 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right." *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989).

There is no question that all Defendants were acting under the color of California law when they engaged in the alleged unconstitutional conduct. Defendants argue, instead, that *their* conduct did not cause Plaintiffs any deprivation of their constitutional or statutory rights.

"A person 'subjects' another to the deprivation of a constitutional right, within the meaning of [§] 1983, if [that person] does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.

---

[7]Defendants also suggest that the federal courts should "abstain" under the "Abstention Doctrine." They appear to confuse abstention with denial of pendent jurisdiction under the "novel and complex" clause of 28 U.S.C. § 1367(c). If they meant abstention proper, they waived that argument because they failed to raise abstention before the District Court. *See Conn. Gen. Life Ins. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Nor do we see any reason that the federal courts would abstain in this situation. *Pullman* abstention is not appropriate because the driving force behind each of Plaintiffs' claims is a right guaranteed by the United States Constitution, and state court clarification of state law would not make a federal court ruling unnecessary. *See R.R. Comm. of Tex. v. Pullman Co.*, 312 U.S. 496, 499-501 (1941).

1978). Indeed, the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743-744.

In limited circumstances, a person can also be subject to § 1983 liability for the acts of others. Although there is no pure *respondeat superior* liability under § 1983, a supervisor is liable for the constitutional violations of subordinates "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

**[7]** Plaintiffs proceed on both of these theories: (a) that Defendants created policies and procedures that violated Plaintiffs' constitutional rights; and (b) that Defendants were willfully blind to constitutional violations committed by their subordinates. Because Defendants were directors and policy-makers for Atascadero State Hospital, we believe Plaintiffs have sufficiently alleged that the constitutional violations they suffered were "set in motion" by Defendants' policy decisions or, at the very least, that Defendants knew of these abuses and demonstrated a deliberate indifference to the SVPs' plight.

**[8]** Defendants are correct that, under *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988), Plaintiffs will need to show how the deliberate indifference or affirmative actions of each defendant caused a constitutional violation before they can seek monetary damages against any individual defendant. At this stage of pleading, however, they need not specifically delineate how each Defendant contributed to the violation of their constitutional rights. Indeed, we do not see how, prior to discovery, they *could* plead the individual roles of each state officer with any more specificity. Taking the statements in the complaint in the light most favorable to the Plaintiffs, Plaintiffs may be able to state a claim against all of the named

Defendants, each of whom played an instrumental role in policy-making and enforcement at Atascadero State Hospital. Therefore, we hold that Plaintiffs have sufficiently alleged Defendants' role in the alleged constitutional violations against SVPs to survive this motion to dismiss.

## E. Defendants' Qualified Immunity Defense

Defendants also argued that the district court erred when it denied them qualified immunity. As Defendants have conceded, qualified immunity is only an immunity from a suit for damages, and does not provide immunity from suit for declaratory or injunctive relief. *See Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993). Defendants instead argue that they are entitled to qualified immunity from all of Plaintiffs' claims to the extent that Plaintiffs seek monetary damages.

In analyzing Defendants' qualified immunity defense, we must determine, taking the facts in the light most favorable to Plaintiffs: (1) what right has been violated; (2) whether that right was so "clearly established" at the time of the incident that a reasonable official would have been aware that the conduct violated constitutional bounds; and (3) whether a reasonable public official could have believed that the alleged conduct was lawful. *See Newell v. Sauser*, 79 F.3d 115, 117 (9th Cir. 1996).

**[9]** In order to withstand Defendants' claims of qualified immunity, then, Plaintiffs must first allege a violation of a right that was clearly established in 1998 — the time the alleged constitutional violations first took place. *See Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002). To defeat qualified immunity, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

But Plaintiffs need not establish that Defendants' "behavior had been previously declared unconstitutional." *Blueford v. Prunty*, 108 F.3d 251, 254 (9th Cir. 1997). In fact, "precedent directly on point is not necessary to demonstrate a clearly established right." *Id.* at 255. Rather, "[i]f the only reasonable conclusion from binding authority were that the disputed right existed, even if no case had specifically so declared, [Defendants] would be on notice of the right and [officials] would not be qualifiedly immune if they acted to offend it." *Id.* If the occasion has not risen for our circuit to reach a question, we may draw clearly established law from other circuits. *Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) (finding a violation of clearly established law where there is "such a clear trend in the case law" that recognition of the right is "only a matter of time").

**[10]** Before we consider Plaintiffs' claims individually to determine whether they were clearly established, we address a threshold question that applies to Plaintiffs' claims more generally. Defendants argue, as a broad proposition, that damages are not appropriate in this suit because the law applicable to SVPs is still evolving. We acknowledge that this suit is unique, in that it is one of the first widespread class actions to challenge the conditions of detention for civilly confined SVPs. Nonetheless, we believe Defendants may have transgressed some clearly established boundaries, or at least, that their claims cannot be dismissed at this stage of litigation. First, civilly detained persons must be afforded "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *see also Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000). It follows logically, then, that the rights afforded prisoners set a floor for those that must be afforded SVPs, and that where Defendants violate a standard that is clearly established in the prison context, the violation is clearly established under the

SVP scheme.[8] Second, where there is a clearly established body of law that applies to all civilly committed persons, there is no reason that the law should not apply to SVPs as well. For, as we have previously held:

> The state cannot have it both ways. If confinement of a sexually violent predator is civil for the purposes of evaluation under the Ex Post Facto clause, that confinement is civil for the purposes of defining the rights to which the detainee is entitled while confined. Civil status means civil status, with all the . . . rights that accompany it.

*Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004). Thus, there are two bodies of law from which we might draw "clearly established" law for qualified immunity purposes: first, where the SVPs claim a violation of a right that is clearly established even in the prison context, and second, where the SVPs claim a violation of a right that is clearly established for all civilly detained persons.

At the same time, we acknowledge at the outset that it is not always clearly established *how much* more expansive the rights of civilly detained persons are than those of criminally detained persons. As discussed below, the rights afforded civilly detained persons are flexible enough to take into account the circumstances of detention. The law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the

---

[8]Contrary to our dissenting colleague's analysis, we see this as a very minor analytical step. The State detains prisoners for the purpose of punishment. It detains SVPs for the purpose of treatment, and its treatment has no punitive element to it. It seems entirely unremarkable, then, to say that the State cannot treat SVPs *worse* than prisoners. The "only reasonable conclusion from binding authority" is that the conditions of confinement for SVPs cannot be more harsh than those under which prisoners are detained. *Blueford*, 108 F.3d at 255.

facility. *See, e.g., Youngberg*, 457 U.S. at 319-322. In weighing those interests, it cannot be ignored that, unlike the plaintiff in *Youngberg* who was civilly committed because of mental infirmities, SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others. Therefore, the rights of SVPs may not necessarily be coexistensive with those of all other civilly detained persons.[9]

With these threshold issues in mind, we review each of Plaintiffs' claims to determine whether Plaintiffs have sufficiently pleaded a violation of clearly established rights.

### 1. Plaintiffs' First and Fourteenth Amendment Rights

Plaintiffs contend that Defendants have retaliated against them for filing lawsuits regarding conditions at Atascadero State Hospital. Specifically, Plaintiffs claim that, as a result of preparing this suit and other complaints about the conditions at Atascadero, Plaintiffs have been subjected to access-level reductions, harassment by Atascadero personnel, excessive room search and seizures of property, and that they have been denied access to the library.

**[11]** It is clear that the Fourteenth Amendment right to

---

[9]We thus agree with our dissenting colleague that context is critical in constitutional claims. Nonetheless, this admission — that it is not clear how much more extensive the rights of SVPs are — does not inexorably lead to the conclusion that there can be no violation of clearly established law. It may not be clear exactly what due process rights are to be afforded SVPs, but surely it is clear that certain actions — forcing Plaintiffs to live in squalid conditions, turning a blind eye to physical attacks against SVPs, and forcing SVPs to take medication as punishment or in retaliation for filing a lawsuit or for refusing to speak during treatment sessions — transgressed the boundary. Surely it would not require "law train[ing]" or clairvoyance to recognize that these actions, as alleged by Plaintiffs, do not comport with due process.

access the courts survives detention. *Bounds v. Smith*, 430 U.S. 817, 821-22 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."); *Cornett v. Donovan*, 51 F.3d 894, 898 (9th Cir. 1995) (holding that "right of access [to the courts] is guaranteed to people institutionalized in a state mental hospital regardless of whether they are civilly committed after criminal proceedings or civilly committed on grounds of dangerousness"). Similarly, punishment in retaliation for exercising one's right to access the courts may constitute a First Amendment violation. *Rizzo v. Dawson*, 778 F.2d 527, 531-32 (9th Cir. 1985). We have held that the prohibition against retaliatory punishment is " 'clearly established law' in the Ninth Circuit, for qualified immunity purposes." *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995). Given the facts alleged,[10] we believe Plaintiffs may be able to prove that they have been punished in retaliation for the exercise of their First and Fourteenth Amendment rights to file grievances about the conditions of their confinement. Accordingly, their claims should not be dismissed at the Rule 12(b)(6) stage.

Plaintiffs also allege that Defendants force them to participate in treatment that violates their First Amendment rights. Specifically, Plaintiffs allege that Defendants bar SVPs from progressing beyond Phase One until they sign a contract admitting that they have an illness and need treatment. The decision to sign the contract is the ultimate "Catch-22": during re-commitment hearings, the contract is used against those who sign it as an admission of illness, and used against those who do not sign it as a refusal to be amenable to treatment.

---

[10]We note that Plaintiffs' original pro se complaint contains particularly persuasive narratives on this issue. Specifically, it details how Atascadero personnel responded when they caught wind of this suit, altering schedules so that the coordinators of this action would not be able to work together, telling Plaintiffs that their meeting in the library was an "illegal assembly," limiting law library time, scheduling mandatory group sessions during the SVPs' library time, and refusing to give SVPs drafting paper because it was "only for the mental patients to draft appeals."

Plaintiffs also allege that SVPs who attend but do not vocally participate in group treatment sessions are found by Defendants to be "not progressing"; accordingly, these SVPs do not advance to higher levels and are subjected to access level restrictions. Plaintiffs argue that they have a First Amendment right to refrain from saying that they have an illness and to refuse to participate in treatment, and that Defendants may not punish them for exercising their rights.

We note that there may be a First Amendment right not to participate in treatment, a right respected by the language of California's SVP Act, if not in its implementation. Specifically, the SVP Act directs:

> Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person. Treatment does not mean that the treatment be successful or potentially successful, *nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program.*

Cal. Welf. & Inst. Code § 6606(b) (emphasis added). While it may be in Plaintiffs' interest to participate in treatment, and the State may create incentives to encourage such participation, it is clear that "[t]he right of freedom of thought and of religion as guaranteed by the Constitution against State action includes both the right to speak freely and the right to refrain from speaking at all." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring). As is the case with prisoners, civilly committed persons certainly retain those First Amendment rights not inherently inconsistent with the circumstances of their detention. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). The language of the above statute strongly suggests that refusal to recognize one's "illness" or affirmatively participate in treatment is not inherently inconsistent with the purposes for which SVPs are detained.

Granted, Plaintiffs are not actually forced to speak. But in this case, the stakes for refusing to speak are so high that Plaintiffs' participation in treatment is almost compulsory. Indeed, an SVP who exercised his right not to admit his illness could be detained indefinitely: he would never advance past Phase One and his refusal could be used against him at his re-commitment hearing as a sign that he was not sufficiently "rehabilitated" to re-enter society.

Several inmates who are criminally detained raised analogous arguments, on *Fifth* Amendment grounds, that programs that force sexual offenders to admit and discuss those offenses violate their rights against self-incrimination. In *McKune v. Lile*, 536 U.S. 24 (2002), the Supreme Court found that a program did not violate the Fifth Amendment where the program "did not extend his term of incarceration . . . [or] affect his eligibility for good-time credits or parole," and the only adverse consequence was that he was moved to the less desirable non-treatment area of the prison. *Id.* at 38-39.

But *McKune* explicitly left open the question of whether a greater deprivation of liberty might run afoul of the Constitution by essentially compelling detainees to incriminate themselves. At least one court, reading *McKune*, allowed an inmate to proceed past pre-trial motions on First Amendment grounds where the right to *parole* was conditioned on participation in treatment. *See Wolfe v. Penn. Dep't of Corrections*, 334 F. Supp. 2d 762, (E.D. Pa. 2004). Similarly, in this case, where the stakes for participation in treatment are so high, the deprivations involved in refusing to participate in treatment may rise to the level of compulsion that might violate the First Amendment.

**[12]** The question at this stage, however, is not whether the right exists, but whether such a right is clearly established under the First Amendment. Given the volatility of the law on this point, we cannot say that it is. The challenged programs are facially related to the purposes for which the SVPs are

detained, and while SVPs may have a right to refuse to partic-
ipate in such treatment, it is not yet clear the extent to which
the State can condition privileges or advancement on partici-
pation in such treatment. As such, we believe these claims
may be more appropriately considered for declaratory or
injunctive relief.

**[13]** Thus, we hold that Plaintiffs' First Amendment claims
were based on clearly established law insofar as they chal-
lenge action in retaliation for filing lawsuits. To the extent
that the claim relies on a First Amendment right not to partici-
pate in treatment sessions, Defendants have qualified immu-
nity, because the law on this point is not clearly established.

## 2.  Plaintiffs' Fourth Amendment Rights

Plaintiffs allege that Defendants' policies and practices
subject Plaintiffs to unreasonable searches, seizures, and
unnecessary use of force. According to Plaintiffs, they are
subjected to public strip searches; to retaliatory searches of
their possessions; and to arbitrary seizure of their personal
belongings upon arrival at Atascadero. SVPs are also placed
in shackles during transport to Atascadero and during visits
from family and friends. When they refuse to participate in
treatment, they are subjected to "red light alarms" even if they
do not post any physical risk.[11] Moreover, they are force-
medicated as a means of intimidation and punishment, and for
the convenience of staff.

Accepting these allegations as true, we believe Plaintiffs
may be able to state a "clearly established" violation of their
Fourth Amendment rights, and thus, the claims are not appro-
priate for dismissal at the Rule 12(b)(6) stage. The watchword
of the Fourth Amendment in *every* context is reasonableness.
As this court held in *Thompson v. Souza*, 111 F.3d 694 (9th

---

[11]As explained in the complaint, a "red light alarm" is when ten to
twenty staff members surround and restrain the patient.

Cir. 1997), "the Fourth Amendment right to be secure against unreasonable searches and seizures 'extends to incarcerated prisoners.' " *Id.* at 699. Thus, this protection certainly extends to SVPs.

[14] Of course, "the reasonableness of a particular search [or seizure] is determined by reference to the [detention] context." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). As with any detained person, there are concerns that mirror those that arise in the prison context: i.e., "the safety and security of guards and others in the facility, order within the facility and the efficiency of the facility's operations." *Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001). But even so, qualified immunity does not protect a search or seizure that is arbitrary, retaliatory, or clearly exceeds the legitimate purpose of detention.

[15] Under this framework, we cannot dismiss Plaintiffs' claim at this stage. The "reasonableness" of a search or seizure is a fact-intensive inquiry that cannot be determined at this stage. *See, e.g., Thompson,* 111 F.3d 694 (9th Cir. 1997) (evaluating the reasonableness of a strip search based on the manner and scope of the search, the place, and the justification). It is impossible to make such a fact-specific determination when the precise circumstances of the searches or seizures are not before the court and when the Defendants have not yet had a chance to explain their justification for the alleged searches or seizures. We cannot say, then, that Plaintiffs cannot possibly state a "clearly established violation" based on any facts consistent with their pleadings.[12] Therefore, Defendants do not have a right to qualified immunity under Federal Rule of Civil Procedure 12(b)(6).

---

[12]The excessive force claims under the Fourth and Fourteenth Amendment — e.g., forced medication, excessive use of red light alarms, and use of shackles — largely duplicate Plaintiffs' excessive force claims under the Eighth and Fourteenth Amendments, and their claims for Substantive Due Process. We will consider all these claims together, below.

### 3.   Double Jeopardy and *Ex Post Facto* Clauses

Plaintiffs allege violations of the double jeopardy clause and *ex post facto* clause. While Plaintiffs concede that these two clauses have punishment as an essential prerequisite, and that the SVP Act is a civil detention statute, they claim that the SVP Act is punitive *as applied to them*. As such, they argue that their double jeopardy and *ex post facto* claims are not barred.

**[16]** In upholding a law similar to California's SVP Act, the Supreme Court held that "[a]n Act, found to be civil, cannot be deemed punitive 'as applied' to a single individual in violation of the Double Jeopardy and Ex Post Facto Clauses and provide cause for release." *Seling v. Young*, 531 U.S. 250, 267 (2001). Similarly, the California Supreme Court stressed the civil nature of a sexually violent predator commitment and rejected challenges to California's SVP Act based on the *Ex Post Facto* and Double Jeopardy clauses of the federal constitution. *See Hubbart v. Superior Court*, 19 Cal. 4th 1138, 1171 (Cal. 1999). We believe Plaintiffs' claims based on the Double Jeopardy and *Ex Post Facto* Clauses of the federal constitution are foreclosed.[13]

**[17]** Plaintiffs argue that *Seling* does not control because they are not "seeking release" as was the habeas petitioner in *Seling*. They raise a purely artificial difference. The court in *Seling* made it abundantly clear that the civil nature of the SVP scheme "cannot be altered based merely on the vagaries in implementation of the authorizing statute." *Id.* at 263. Accordingly, we find that the civil nature of California's SVP

---

[13]*Seling* did not, however, alter our authority to consider implementation of the SVP Act on Plaintiffs' other claims. *See Seling*, 531 U.S. at 266 ("This case gives us no occasion to consider how the civil nature of a confinement scheme relates to other constitutional challenges, such as due process, or to consider the extent to which a court may look to actual conditions of confinement and implementation of the statute to determine in the first instance whether a confinement scheme is civil in nature.").

Act is not altered because of the remedy sought and we reverse the district court's order denying Defendants' motion to dismiss as to the *Ex Post Facto* and Double Jeopardy Clause related claims.

### 4. Plaintiffs' Eighth and Fourteenth Amendment Claims

[18] Plaintiffs allege in their complaint that the "restrictive and denigrating conditions" at the Atascadero State Hospital constitute cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment has, as an essential prerequisite, the right to punish. *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199 n.6 ("The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). Here, SVPs are detained for the purpose of treatment, and the state's power to punish them expires at the end of their sentence. Accordingly, the Eighth Amendment is not the proper vehicle to challenge the conditions of civil commitment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

[19] The thrust of Plaintiffs' claim here is that because the conditions of confinement amount to punishment, they should be permitted to argue that this "punishment" is cruel and unusual. Once again, this "punitive as applied" argument is foreclosed by *Seling*. Therefore, we find that the district court erred when it failed to dismiss the Eighth Amendment claim against Defendants.

Of course, this is a small victory for Defendants, because the same claims for inhumane treatment and failure to protect may be raised under the Fourteenth Amendment. The standard applicable to SVPs under the Fourteenth Amendment are *at least* coextensive with that applicable to prisoners under the Eighth Amendment. *See, e.g., Munoz v. Kolender*, 208 F. Supp. 2d 1125 (S.D. Cal. 2002) (applying Fourteenth Amend-

ment standards to SVPs because "comparable standards apply to both prisoners' Eighth Amendment cruel and unusual punishment and Fourteenth Amendment substantive due process analyses, with Fourteenth Amendment analysis borrowing from Eighth Amendment standards."); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (applying Eighth Amendment standards to evaluate pretrial detainees' Fourteenth Amendment claims). Moreover, the Eighth Amendment provides too *little* protection for those whom the state cannot punish. *See Jones v. Blanas,* 393 F.3d 918, 931-34 (9th Cir. 2004); *Andrews v. Neer*, 253 F.3d 1052 (8th Cir. 2001). Plaintiffs apparently recognize this, because their Eighth Amendment claims largely duplicate those raised under the substantive due process clause of the Fourteenth Amendment. Accordingly, we consider, below, under the Fourteenth Amendment Plaintiffs' allegations that Defendants' actions violate their due process rights.

### 5.  Plaintiffs' Procedural Due Process Rights Under the Fourteenth Amendment

Plaintiffs raise a number of procedural due process violations against Defendants. Plaintiffs allege that Defendants force them to participate in the five-phase treatment program at Atascadero; force them to take medication in non-emergency situations; and subject them to privilege reductions, access level reductions, and reclassifications. Plaintiffs allege that these deprivations occur without adequate notice of or opportunity to respond to accusations of alleged sanctionable conduct.

[20] The Fourteenth Amendment requires that no person be deprived of life, liberty, or property without due process of law. That is, even if Defendants may deprive SVPs of certain privileges, those deprivations may not be carried out without notice and an opportunity to be heard. Defendants do not challenge, at least at this stage, that Plaintiffs were deprived of certain privileges, or that these deprivations did not carry

with them the attendant due process required under the Fourteenth Amendment. Rather, Defendants argue that Plaintiffs have not adequately pleaded the loss of an established liberty or property interest when they are force-medicated, when their access-levels are reduced, or when they lose other privileges.

[21] We disagree. Convicted prisoners, pretrial detainees, and parolees all possess a liberty interest in avoiding the unwanted administrations of antipsychotic drugs. *See, e.g., Washington v. Harper*, 494 U.S. at 221-22 (holding that prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment" and identifying procedures which comported with due process). Thus, at a minimum, an individual civilly committed under California's SVP Act has a right to procedural due process before being force-medicated in non-emergency situations.

Next, Plaintiffs allege that reduction of their access levels decreases, or in some cases eliminates, the opportunity to move around the facility without escorts and that it affects their right to other privileges. The reduction of an SVP's access level is similar to the transfer of prisoners from the general prison population to administrative segregation. Such a transfer may deprive the prisoner of a state-created liberty interest. *See Sandin v. Connor*, 515 U.S. 472, 484 (1995) (holding that a state-created liberty interest in one's classification may exist where classification imposes "atypical and significant hardship"); *see also Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (holding that a prison inmate was deprived of liberty and property because he was reclassified thereby losing certain privileges). Thus, Plaintiffs may have a liberty interest in their access levels and classifications that affect their privileges.

[22] In sum, it is clearly established that an *inmate* has a state-created liberty interest and a right to be free from restric-

tions that "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84. Where Defendants have transgressed a line clearly established even in the prison context, we have no trouble deeming the line clearly established for SVPs. Therefore, we hold that Plaintiffs' Fourteenth Amendment Procedural Due Process claims are based on clearly established rights.

### 6.  Plaintiffs' Fourteenth Amendment Substantive Due Process Claims

Plaintiffs contend that Defendants have violated their substantive due process rights because Defendants have failed to protect them from the abuse of other detainees and employees. Their claims can be broken down into three general categories: (a) claims that Defendants failed to protect Plaintiffs from the abuses of other persons detained at Atascadero; (b) claims that Defendants failed to provide constitutionally adequate conditions of detention; and (c) claims that Defendants use excessive force against them.[14]

First, Plaintiffs claim that Defendants have turned a blind eye to the conduct of other persons detained at Atascadero State Hospital. Specifically, Plaintiffs allege that they are intentionally exposed to feces, urine, vomit, spit, and blood in Atascadero's courtyards, bathrooms, hallways, dining rooms, and gymnasium, and that other detainees contaminate their food with spit and other unsanitary taint. Plaintiffs allege that they are subjected to verbal harassment, physical abuse, and sexual assaults by other patients at the Hospital, and indeed that they are targeted because they are sex offenders.

The patient population at Atascadero State Hospital com-

---

[14]Here we consider Plaintiffs' substantive due process allegations from their Second Alleged Claim, their Fifth Alleged Claim and their Seventh Alleged Claim.

prises males who are civilly or penally committed. The individuals committed at the Hospital are confined under a variety of statutes. *See* Cal. Penal Code § 1026 (covering patients "not guilty by reason of insanity"); Cal. Penal Code § 1370 (covering patients "incompetent to stand trial"); Cal. Penal Code §§ 2962, 2964 (covering "mentally disordered offenders" serving their parole time); Cal. Welfare and Institutions Code § 6316 (covering "mentally disordered sex offenders"); Cal. Penal Code § 2684 (covering mentally ill prisoners transferred to Atascadero State Hospital for psychiatric stabilization). According to Plaintiffs, their forced integration as openly labeled "sexually violent predators" has subjected them to verbal harassment, physical abuse, and sexual assaults from the rest of the Atascadero population.

[23] Plaintiffs' right to be protected and confined in a safe institution are clearly established. *See Youngberg*, 457 U.S. at 319-22 (stating that individuals who are involuntarily civilly committed have constitutionally protected rights under the Due Process Clause to reasonably safe conditions of confinement and freedom from unreasonable bodily restraints). The right is clearly established for civilly committed persons and prisoners alike. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (internal citations omitted)); *Neely v. Feinstein*, 50 F.3d 1502, 1508 (9th Cir. 1995) (finding "clearly established" that patients have a "constitutional right to be safe in the state institutions to which they are committed"). Assuming Plaintiffs can prove the allegations in their complaint and Defendants' blindness to such conditions in Atascadero, qualified immunity would not be appropriate on these claims.

[24] Second, Plaintiffs allege that the conditions of confinement are constitutionally inadequate, that they are forced to live in squalid conditions that are inhumane and pose a serious health risk. Plaintiffs have a clearly established right not to be exposed to such unsanitary conditions. *See Anderson v.*

*County of Kern*, 45 F.3d 1310, 1314-15 (9th Cir. 1995) (collecting cases in prison context); *Youngberg*, 457 U.S. at 315-16 (establishing a right to "personal security" for involuntarily committed persons).[15] Given the allegations in the Second Amended Complaint, Plaintiffs' claims as to the unsanitary and unsafe conditions of confinement cannot be dismissed under Federal Rule of Civil Procedure 12(b)(6).

[25] Plaintiffs also allege several claims of excessive force, i.e., that (a) "red light alarms" are used when Plaintiffs orally refuse to participate in treatment, even if they pose no threat of physical violence; (b) that shackles are used during transportation and during visits with family and friends; and, more generally, (c) that Plaintiffs are subjected to "excessive punishment . . . [and] excessive use of force and physical restraints." It is well-established that detained persons have a right to be free from excessive force. While excessive force claims by prisoners are reviewed under the Eighth Amendment's malicious and sadistic standard, *Hudson v. McMillian*, 503 U.S. 1 (1992), the more generous Fourteenth Amendment standard applies to those who are civilly confined. As we previously stated:

> If confinement of a sexually violent predator is civil for the purposes of evaluation under the Ex Post Facto clause, that confinement is civil for the purposes of defining the rights to which the detainee is entitled while confined [in a treatment facility]. Civil status means civil status, with all the Fourteenth Amendment rights that accompany it.

*Jones*, 393 F.3d at 933.

---

[15]In the prison context, claims of unsanitary conditions are evaluated under the Eighth Amendment. *See Anderson*, 45 F.3d at 1314. Although the Eighth Amendment does not apply here, similar standards may apply to SVPs under the Fourteenth Amendment. *See Munoz v. Kolender*, 208 F. Supp. 2d 1125, 1146 (S.D. Cal. 2002).

The Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, *Bell*, 441 U.S. at 536, within the bounds of professional discretion, *Youngberg*, 457 U.S. at 321-22. Moreover, the "due process requires that the conditions and duration of confinement [for civilly confined SVPs] bear some reasonable relation to the purpose for which persons are committed." *Seling*, 531 U.S. at 265; *see also Jones*, 393 F.3d at 931. While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. *See Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001) (applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).[16]

[26] We also reiterate that SVPs must, at a minimum, be afforded the rights afforded prisoners confined in a penal institution. Thus, the Eighth Amendment still provides a floor for the level of protection that SVPs must receive under the Fourteenth Amendment, and because the contours of the Eighth Amendment are more defined, Eighth Amendment jurisprudence may provide helpful guidance as to the standards to be applied. Under the Eighth Amendment, the unnecessary and wanton force standard takes into account such facts as the need for the application of force, the relationship between the need and the amount of force used, the threat perceived by the officer, any effort to temper the severity of the forceful response, and the extent of the injury inflicted, and whether the force was applied for a legitimate purpose. *Hud-*

---

[16]While *Jones*, *Neer*, and *Seling* are more recent cases, they do little more than restate the contours of law clearly established in *Youngberg v. Romeo*, a 1982 case, and *Bell v. Wolfish*, a 1979 case. *Seling* essentially restates the *Youngberg* test, and *Jones* does little more than connect the line between *Youngberg* and SVPs based on California's argument that the statute should be construed as a civil confinement statute. We believe a reasonable official reading *Youngberg* would have sufficient notice that they would be held to *Youngberg*'s standards of due process.

*son v. McMillian*, 503 U.S. 1, 7 (1992). If Plaintiffs allege conduct that sinks *below* those protections afforded prisoners under the Eighth Amendment, then their claim certainly states a violation of their rights under the Fourteenth Amendment.

[27] Plaintiffs have alleged that force is used in retaliation for exercising legitimate rights and that the amount of force used is often a gross overreaction to the situation. Such use of force, if proved, is not reasonable and failure to curtail such abuses cannot be said to be within Defendants' professional discretion. We affirm, then, the district court's denial of the motion to dismiss on these grounds.

On each of these three grounds — failure to protect, inadequate conditions of confinement, and excessive force — we believe that Plaintiffs may be able to state a "clearly established" Fourteenth Amendment Substantive Due Process violation, and we cannot, at the Federal Rule 12(b)(6) stage, dismiss these substantive due process claims.

### 7. Plaintiffs' Equal Protection Rights Under the Fourteenth Amendment

According to Plaintiffs, they are being treated more restrictively than other civilly committed patients. They allege that their conditions are more punitive than those under which all other civilly committed persons are held. For one example, they allege that other civilly-committed persons are given priority in hiring for remunerative positions.

[28] Even though Plaintiffs do not constitute a suspect class, heightened scrutiny may be required where fundamental interests are at issue. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Police Dept of City of Chicago v. Mosley*, 408 U.S. 92 (1972). This court upheld application of a "heightened scrutiny standard" when evaluating an equal protection violation under Washington State's Sexually Violent Predator Statute. *See Young v. Weston*, 176 F.3d 1196,

1201 (9th Cir. 1999), *rev'd on other grounds, Seling*, 531 U.S. 250. While *Young* was decided in 1999, it rested on a firmly established principle in existence at the time of events in question: that heightened scrutiny will be applied where a fundamental liberty interest is at stake. *See Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942). Plaintiffs may be able to claim violations of several clearly established fundamental rights: a liberty interest in freedom from bodily restraint and personal security, *Youngberg*, 457 U.S. at 315-316, and a fundamental right to access the courts, as described below. Accordingly, we agree with Plaintiffs that heightened scrutiny is the standard for equal protection claims implicating these fundamental rights. And we further observe that Plaintiffs, in line with their allegations, may be able to show that the differential treatment between them and other civilly committed persons violates equal protection because such treatment does not meet heightened scrutiny.

**[29]** At the same time, we cannot say that it is firmly established that *every* condition of an SVP's confinement is subject to heightened scrutiny. In the prison setting, we have made clear that prison officials need latitude in deciding how to run their prison, and we have refused to subject each classification drawn by prison officials to heightened scrutiny. Rather, a prisoner cannot challenge the conditions of his confinement on equal protection grounds unless the discrimination against him is irrational or arbitrary. *See McGinnis v. Royster*, 410 U.S. 263, 276 (1973). That is, in so far as Plaintiffs' claims rely on classifications not related to fundamental liberty interests, Defendants will have qualified immunity unless there is no rational basis for the classification.

**[30]** Even under the rational basis standard, we cannot dismiss Plaintiffs' equal protection claims at this stage. Plaintiffs' pleadings raise several questionable classifications. For example, it seems arbitrary that SVPs should be treated more harshly that other civilly committed persons in job placement and privileges. Based on the pleadings, we believe that Plain-

tiffs may be able to prove a violation of clearly established law congruent with the facts alleged. Admittedly, at this stage, Defendants have not fully developed and presented the rationale for their actions and there may be differences between SVPs and other civilly committed persons that warrant differential treatment. But we leave it to the district court, on a more full factual record, to consider whether the classifications Plaintiffs present are irrational and arbitrary.

### 8. Plaintiffs' Sixth Amendment Right to Counsel and Fourteenth Amendment Right of Access to Courts

Plaintiffs claim that they cannot privately correspond with counsel, have telephone conversations with counsel, and are otherwise hindered in their ability to prepare for their probable cause and commitment hearings. According to Plaintiffs, "[t]his inability to prepare for upcoming hearings would clearly hinder Plaintiffs' access to the courts and counsel."

[31] Plaintiffs have a statutory right to counsel in probable cause proceedings and in commitment hearings. Cal. Welfare & Institutions Code §§ 6602, 6603, 6605(d). To protect the right to counsel, "a [detainee] must be given a reasonable opportunity to employ and consult with counsel; otherwise, the right to be heard by counsel would be of little worth." *Chandler v. Fretag*, 348 U.S. 3, 10 (1954). While the Sixth Amendment, by its express language, protects those in *criminal* proceedings, the Fourteenth Amendment protects all detainees against governmental interference in their right of access to courts. *See Procunier v. Martinez*, 416 U.S. 396, 419-20 (1974) (overruled on other grounds); *Cornett v. Donovan*, 51 F.3d 894, 897 & n.4 (9th Cir. 1995). The right of access to courts has been found to encompass the right to talk in person and on the telephone with counsel in confidential settings, *Procunier*, 416 U.S. at 419; *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990), and to use available law library resources, *Kennan v. Hall*, 3 F.3d 1083 (1996), subject to

legitimate restrictions related to the purpose and circumstances of detention. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). Where such rights have been upheld in the prison context, there is no question that SVPs must be afforded rights that are at least as broad.

**[32]** Such a fact specific inquiry can hardly be undertaken at this point, when it is not clear what Defendants have done to impede access to the courts, or why they have done so, or how the Defendants' actions have affected Plaintiffs' right of access. We believe, nonetheless, that Plaintiffs may be able to state a violation of clearly established law congruent with their allegations and we affirm the district court's order denying Defendants' Rule 12(b)(6) motion to dismiss as to Plaintiffs' Tenth claim based on access to courts.

### 9. Plaintiffs' Right to Privacy under the Fourteenth Amendment

**[33]** Plaintiffs allege that Defendants' policies do not allow for privacy when showering, sleeping, using the toilets or participating in therapy sessions. It is clearly established that the Fourteenth Amendment protects a sphere of privacy, and the most "basic subject of privacy . . . the naked body." *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir. 1985). While the circumstances of institutional life demand that privacy be limited, it is clearly established that gratuitous invasions of privacy violate the Fourteenth Amendment. *Id.* Once again, we reach a highly factual inquiry where the facts are not fully developed: in *Grummett*, for example, we considered the gender of those prison officials who viewed inmates, the angle and duration of viewing, and the steps the prison had taken to minimize invasions of privacy. *Id.* at 494-95. Such facts are simply not available to us at this stage of proceedings.[17] We

---

[17]Moreover, we note that it is not, as Defendants hinted in their briefs to this court, the burden of the SVPs to show that there is no compelling justification for the regulations, but rather the burden of the State to show that there is such a justification. *See Walker v. Sumner*, 917 F.2d 382, 385-87 (9th Cir. 1990).

believe, nonetheless, that Plaintiffs may possibly be able to state a violation of clearly established law congruent with their allegations, and as such we will not dismiss their claim under Federal Rule of Civil Procedure 12(b)(6).

\*\*\*

In sum, we affirm the district court's decision to deny qualified immunity on Plaintiffs' first, second, sixth, seventh, eighth, ninth, and tenth causes of action to the extent noted above. We reverse and hold that Defendants have qualified immunity from suit on Plaintiffs' Ex Post Facto, Double Jeopardy, and Eighth Amendment claims.

### F.   Defendants' Belief That Their Conduct Was Lawful Was Not Objectively Reasonable

**[34]** Even if Plaintiffs have alleged violations of a clearly established right, a government official is entitled to qualified immunity if he or she "could . . . have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001); *see also Alford v. Haner*, 333 F.3d 972, 977 (9th Cir. 2003). This is a limited exception, however: if the law is clearly established, the immunity defense "ordinarily should fail, since a reasonably competent public official should know the law governing [the official's] conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).

**[35]** Whether Defendants' conduct was reasonable involves a factual analysis of the circumstances surrounding Defendants' actions and a determination of whether a reasonable official similarly situated would have been aware that his/her actions violated the law, an inquiry difficult to conduct at this stage. Based on the facts in front of us, however, we do not believe Defendants can claim that their conduct was objectively reasonable. Again, Defendants argue that the volatile

nature of the law surrounding SVPs entitles them to escape liability entirely. We do not adhere to the theory that "every dog is entitled to one bite." Defendants could not have been so completely in the dark about the standards that would apply to their conduct as it related to SVPs. As explained above, SVPs are not entirely dissimilar from other groups of civilly committed persons. Moreover, Plaintiffs' complaint alleges practices that would be unconstitutional if directed at any prisoner. Accordingly, Defendants cannot escape liability based on a "reasonable but mistaken" belief about the constitutionality of their conduct.

## *CONCLUSION*

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part the district court's order denying Defendants' second motion to dismiss under Rule 12(b)(6). Each side to bear its own costs.

---

TROTT, Circuit Judge, concurring in part and dissenting in part:

My disagreement with my colleagues is limited to one issue. We agree that plaintiffs cannot seek damages in this lawsuit against state officials in their *official* capacities, and that plaintiffs cannot seek damages from the State either. So, what is left where the officials are concerned? A lawsuit against them for acts and omissions alleged to have been taken in the discharge of their official duties, but as individuals, not officials. It is here that I part company.

On this record, and under these circumstances, I conclude, with all respect to my colleagues, that these officials as individuals are clearly entitled to qualified immunity against both suit and damages — now, not later. In my view, the particulars and the contours of the alleged constitutional rights upon

which the plaintiffs rely were not so clearly established at the times under scrutiny and at the level of specificity required such that a reasonable official hired by the state to cope with lawfully confined sexually violent predators subject to remedial treatment would have been aware that the conduct alleged violated constitutional bounds. Given the unsettled nature of the law in this area, a reasonable official could certainly have believed otherwise.

We decide this appeal with clear analytical guidance from the Supreme Court:

> Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.
>
> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. *Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of*

> *pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages.*" It should not be surprising, therefore, that our cases establish that *the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense*: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *but it is to say that in the light of pre-existing law the unlawfulness must be apparent*.

*Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987) (emphasis added) (alteration in original) (internal citations omitted).

As my colleagues acknowledge, "this suit is unique, in that it is one of the first widespread class actions to challenge the conditions of detention for civilly confined SVPs." It is not only unique, but it requires us to answer questions never before squarely addressed in this context. This factor alone should be enough to entitle these individual defendants to dismissal.

My colleagues hang their analytical hat on *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982) for the proposition that "civilly detained persons must be afforded 'more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.' " This is a nice general quote mined out of context from that case, but it gets us nowhere in pursuit of an answer to the central ques-

tion of whether we have *in this lawsuit* violations of clearly established rights. Why? Because *Youngberg* dealt with the confinement for their own good of mentally defective persons. In contrast, and as recently recognized by the Supreme Court, sexually violent predators are confined in order to protect "the public from dangerous individuals with treatable as well as untreatable conditions." *Seling v. Young*, 531 U.S. 250, 262 (2001). In addition, the Court said that the case before it for decision "gives us no occasion to consider how the civil nature of a confinement scheme relates to other challenges, such as due process . . . ." *Id.* at 266. It is little wonder, therefore, that my colleagues admit in connection with *Youngberg* that "it is not always clearly established *how much more expansive* the right of civilly detained persons are than those of criminally detained persons." I disagree with my colleagues' claim that "it follows logically [from *Youngberg*], then, that the *rights afforded prisoners* set a floor for those [rights] that must be afforded SVPs, and that where Defendants violate a standard that is clearly established *in the prison context*, the violation is clearly established under the SVP scheme." Where does this come from? It sounds new to me. Certainly it is not a proposition clearly established and controlling at the time relevant to this lawsuit. Prisoners have constitutional rights flowing from certain constitutional guarantees that do *not* apply out of the criminal context. Which clearly established "prisoner rights" are they talking about? I cannot find my colleagues' bold assertion anywhere in any case before this one. Where is the required level of specificity required to hold these *individuals* constitutionally and monetarily responsible for their acts? It is nowhere to be found. Where is the fair warning to them as to the constitutional limits of their compulsory treatment programs? Expanding and extending some rights from other contexts and extrapolating others defies the purpose of the doctrine of qualified immunity.

The courts have yet to clarify how the Constitution protects sexually violent predators from various confinement and

treatment modalities. Context is critical to the determination of whether a constitutional right has been established. This principle was confirmed by the Supreme Court in *Washington v. Harper*, 494 U.S. 210 (1990), a lawsuit filed by a mentally ill state prisoner complaining against treatment with anti-psychotic drugs against his will and without a judicial hearing. In holding that such treatment did not violate either substantive or procedural due process, the Court said, "The extent of a prisoner's right under the Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement." *Id.* at 222.

We read the same message in *Parham v. J.R.*, 422 U.S. 584, 608 (1979): "What process is constitutionally due cannot be divorced from the nature of the ultimate decision that is being made." *See also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

Noteworthy in *Washington v. Harper* was a holding by the Washington Supreme Court that the individual defendants were entitled to qualified immunity, 494 U.S. at 218 n.5. The case was allowed to proceed, but only to consider claims for injunctive and declaratory relief under § 1983 as well as state law — which is precisely what should happen here. It seems that we are now requiring doctors and other staff to consult not just with lawyers before they devise a procedure or treatment for a sexually violent predator, but with the courts.

The Supreme Court warned against this result in *Parham*, saying, "Due process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer. Surely, this is the case as to medical decision, for neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgements. . . . The mode and procedure of medical diagnostic procedures is not the business of judges." *Id.* at 607-08 (internal citations and quotations omitted).

The penalty for not anticipating a court ruling will be individual liability. This unfortunate situation is precisely what the doctrine of qualified immunity is designed to avoid.

I take issue also with my colleagues' assertion that because the facts are not yet developed, it is too early in this lawsuit to dismiss on qualified immunity. This claim misses the mark. As held repeatedly by the Supreme Court, qualified immunity is immunity from being sued, not just from damages. This principle explains (1) why the Court warned in *Anderson* against non-specific pleadings that allege violations of "extremely abstract rights," 483 U.S. at 639; and (2) the Court's holding in *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) that, "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." The Court revisited this issue again in *Behrens v. Pelletier*, 516 U.S. 299 (1996). In the course of overruling a mistaken opinion by the First Circuit, the Court said,

> The source of the First Circuit's confusion was its mistaken conception of the scope of protection afforded by qualified immunity. *Harlow* and *Mitchell* make clear that the defense is meant to give government officials a right, not merely to avoid "standing trial," but also to avoid the burdens of "such *pretrial* matters as discovery . . . , as '[i]nquiries of this kind can be peculiarly disruptive of effective government.' "

*Id.* at 308 (quoting *Mitchell*, 472 U.S. at 526 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982))) (alterations in original). The Court, in reversing us in 1991 on this very issue, said, "[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Finally, my colleagues express their caution "not to eviscerate the notice pleading standard" that the system generally

uses to commence a lawsuit. I do not believe this caution is well suited to this context. Again, I reiterate that the question of qualified immunity requires prompt resolution. *Anderson* would seem to require pleadings more specific than the usual "notice" standard. At the very least, pleadings against state officials in their individual capacities must demonstrate an alleged violation of a particularized and relevant constitutional right which has been clearly established. *Hunter v. Bryant* also would seem to so require. To hold otherwise is to disserve a doctrine that calls for resolution at the "earliest possible stage" in litigation. *Id.* at 227.

The question remains, how specific must the right allegedly violated be defined in order to answer the question whether it was clearly established? *Wilson v. Layne*, 526 U.S. 603 (1999) gives us a good example of the degree of specificity required. In *Wilson*, the Court concluded first that officers who took members of the media into a homeowner's home to observe and to record the execution of an arrest warrant did so in clear violation of the Fourth Amendment. Nevertheless, the Court concluded also that the officials who did so were entitled to qualified immunity. The Court said that the appropriate question "is . . . whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful . . . ." *Id.* at 615. Concluding that at the time of the violation the law was "at best undeveloped," the Court said, "Given such an undeveloped state of the law, the officers in this case cannot have been 'expected to predict the future course of constitutional law.' " *Id.* at 617 (quoting *Procunier v. Navarette*, 434 U.S. 555, 562 (1978)).

From these precedents, I conclude that the proper question in this case is whether it was clearly established at the time of the events in this case that the Constitution prohibited these individual officials from engaging in any of the actionable behaviors attributed to them in connection with the management and treatment of sexually violent predators civilly con-

fined under state law for treatment and for the protection of the public. After reviewing all the relevant cases and authorities, I answer this question in the negative.

Viewed in this light the analytical error made by my colleagues becomes quite apparent when they say,

> Thus, there are two bodies of law from which we might draw "clearly established" law for qualified immunity purposes: first, where the SVPs claim a violation of a right that is clearly established even in the prison context, and second, where the SVPs claim a violation of a right that is clearly established for all civilly detained persons.

What this acknowledges is that we cannot find any clearly established substantive rights in the SVP context, so we have to borrow them from other areas, such as prison rights and the rights of persons civilly detained for their own good and who pose a demonstrated threat to society. An approach like this certainly works well when the question is what constitutional rights might these sexually violent predators have in this system, but it fails utterly when the issue is whether we hold individuals liable ex post facto for their actions.

This lawsuit should proceed so that specific answers can be found to the constitutional questions raised by the plaintiffs, but it should proceed only in connection with possible declaratory or injunctive relief. To do otherwise will deter government officials in the future from doing anything not to the liking of a sexually violent predator. The penalty for making a good faith mistake in an area of undeveloped law may be the costs of a lawsuit and the potential personal liability arising out of the official performance of a state job.